IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Estate of RUTH M. DORMAIER, Deceased, by and through LOURENCE C. DORMAIER, Personal Representative; and LOURENCE C. DORMAIER, individually, and as the Beneficiary of his wife's Estate, | ) ) ) ) ) ) ) ) | No. 30864-2-III Consolidated with No. 30865-1-III |
| Respondents, | ) ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| COLUMBIA BASIN ANESTHESIA, P.L.L.C., A Professional Limited Liability Company; ROBERT MISASI, C.R.N.A., and JANE DOE MISASI, individually, and as husband and wife; GRANT COUNTY HOSPITAL DISTRICT #1, d/b/a SAMARITAN HEALTHCARE, a/k/a SAMARITAN HOSPITAL, a Washington non-profit organization, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Appellants. | ) | |

BROWN, J. — Appellants Robert Misasi, CRNA; his employer, Columbia Basin

Anesthesia PLLC (collectively Mr. Misasi); and the hospital where he worked, Grant

County Hospital District No. 1 (Samaritan Hospital), appeal a verdict for respondents

Lourence C. Dormaier and the estate of Ruth M. Dormaier on their wrongful death claim

based on medical negligence. Appellants contend the trial court erred in:

(1) instructing the jury on a medical patient's lost chance of survival;
(2) ruling res judicata precluded them from allocating fault to the physicians;
(3) denying their motion for judgment as a matter of law;
(4) denying their request for entry of judgment in their favor upon the special verdict; and
(5) denying their request for a judgment award limited to the estate's damages or alternatively, 70 percent of both respondents' damages.

We reject all of appellants' contentions, and affirm.

## FACTS

On September 15, 2007, Mrs. Dormaier, age 79, fractured her elbow in a fall. At Samaritan Hospital in Moses Lake, she received emergency care and discharge instructions to follow up at Wenatchee Valley Medical Center. Orthopedist Daniel W. Canfield, MD scheduled her for surgery to commence on September 20, 2007 and ordered a preoperative evaluation. Internist K. Craig Hart, MD determined she was fit for surgery as of September 18, 2007. The next day, Dr. Canfield visited her and noted she had chest and hip pain, shortness of breath, and low blood oxygen saturation. He ordered chest x-rays, which showed either patchy infiltrate[1] or atelectasis[2] in the lower lobe of her left lung, and hip x-rays, which later showed no fractures. He conferred with Dr. Hart, who concluded her chest x-rays probably showed atelectasis resulting from her splinted breathing.[3] The physicians decided to attempt surgery before her condition deteriorated further.

---

[1] Patchy infiltrate is the displacement of air space by an infiltrating substance in the lung. It is a nonspecific chest x-ray finding that could indicate, for example, atelectasis, pneumonia, or pulmonary embolism.
[2] Atelectasis is the collapse of tiny air sacs in the lung.
[3] Splinted breathing is a pattern of shallow breaths minimizing movement of and pain from an injured area of the body.

2

Around 10:00 a.m. on September 20, 2007, Mrs. Dormaier checked in for surgery at Samaritan Hospital. Mr. Misasi served as her nurse anesthetist. She had wheezy breathing, shortness of breath, low blood oxygen saturation, and excruciating pain. He ordered oxygen, a drug to open her airways, and a drug to alleviate her pain. Then, after examining her and conferring with Drs. Canfield and Hart, Mr. Misasi anesthetized Mrs. Dormaier for surgery at 12:10 p.m. Mrs. Dormaier suffered a terminal cardiac arrest during surgery, around 3:00 p.m. An autopsy revealed a large blood clot caused her death when, within seconds, it detached from her hip veins, migrated through her heart, and blocked her lung arteries; as a prelude, many smaller blood clots had been lodging in her lung arteries in the hours or days leading up to her death. In medical terms, a pelvic deep venous thrombosis initially released many smaller emboli, which caused survivable pulmonary embolisms, but finally released a large embolus, which caused a fatal pulmonary embolism.[4]

In April 2009, respondents sued Dr. Canfield, Dr. Hart, and Wenatchee Valley Medical Center (collectively Drs. Canfield and Hart) as well as Mr. Misasi and Samaritan Hospital. The complaint alleged Mrs. Dormaier "died as a proximate result of the negligence of the Defendants" and "sustained injuries and damages and died due to the negligence of Defendants." Clerk's Papers (CP) at 9. Stating medical negligence and wrongful death claims, the complaint specified Mr. Misasi's decision to anesthetize Mrs. Dormaier instead of refer her for proper care "was a proximate cause of the injury and

---

[4] A blood clot is a thrombus when attached to a blood vessel wall and an embolus when detached and migrating through the bloodstream. A pelvic deep venous

3

death to [her]." CP at 10. The estate alleged its wrongful death damages included "pain and suffering, anxiety, emotional distress and humiliation that [Mrs. Dormaier] may have endured prior to her death"; "disabilities, loss of enjoyment of life, cost of medical, hospital, and funeral expenses"; "loss of love, affection and companionship to the beneficiaries"; and "any future economic losses in support and care of [Mr. Dormaier]." CP at 13. Mr. Dormaier alleged his wrongful death damages included "[e]motional damages," "[p]ast and future economic damages," "[l]oss of support," "[l]oss of care," "[l]oss of services," "[l]oss of society," and "[l]oss of consortium." CP at 12. The complaint prayed for judgment compensating these damages and other "general and special damages as may be proven by the Plaintiff at the time of trial." CP at 13-14.

Mr. Misasi and Samaritan Hospital each pleaded nonparty fault as an affirmative defense in their answers, but Drs. Canfield and Hart moved successfully for summary judgment dismissal of respondents' claims against them. No party opposed the motion. Consistent with their non-opposition, appellants' trial briefs introduced their case theory that Drs. Canfield and Hart were not negligent and, because Mr. Misasi relied on them and acted jointly with them as part of a team, he was equally not negligent.

Through motions in limine 1 and 14, respondents sought to prohibit appellants from allocating fault to Drs. Canfield and Hart. Appellants mainly responded by asking the trial court to defer ruling on the motions, stating an immediate ruling was unnecessary because they did not intend to allocate fault to Drs. Canfield and Hart and

---

thrombosis is the formation of a thrombus in the hip's deep veins. A pulmonary embolism is the lodging of an embolus in the lung's arteries.

No. 30864-2-III, *consol. with* No. 30865-1-III
*Estate of Dormaier v. Columbia Basin Anesthesia, PLLC*

would instead advance their previously declared case theory. The trial court eventually granted both motions.

At trial, respondents elicited expert testimony from Erik R. Swenson, MD, Steven Hattamer, MD, Jeffrey McBride Reynolds, MD, and Lloyd Halpern, MD. Dr. Swenson partly testified,

> Q. Doctor, looking at this case and taking into account all of the records that you reviewed, do you have an opinion as to whether or not had Mrs. Dormaier been properly diagnosed with pulmonary embolus and treated with anticoagulation, whether she would have survived?
> A. It's been my experience over the entire time of my career that if we can diagnose this, we have a good chance once beginning therapy to take a mortality rate of possibly 70 to 80 percent and bring it down into the ten to 20 percent rate.
> . . . .
> Q. So based upon your earlier testimony, Doctor, if you factor out cardiopulmonary function people and the terminal illness people, my understanding is that the percentage of people that survive from this treatment is approximately 90 percent?
> A. Right. When you strip away the people who have very, very bad chronic medical conditions which lead them to have no reserve or people with cancers and other much more rare conditions that are life-threatening.
> Q. And in your opinion, would Mrs. Dormaier, if appropriately treated, have had a 90 percent chance of survival?
> A. I believe so.

Report of Proceedings (RP) at 258-60.

The parties revisited motions in limine 1 and 14 several times throughout trial. Appellants consistently reiterated they would not allocate fault to Drs. Canfield and Hart. Respondents requested the trial court instruct the jury not to consider whether Drs. Canfield and Hart were negligent. The trial court eventually decided to give the

5

instruction. Mr. Misasi objected, arguing the instruction was unnecessary. The instruction reads,

> In this case, there is no issue for you to consider regarding the negligence, if any, of Daniel Canfield, MD or of Kenneth Hart, MD. You must not speculate regarding any such negligence, or the absence thereof, and must resolve the claims of the parties in this case based upon the evidence admitted, without regard to whether or not Dr. Canfield or Dr. Hart were negligent. You may consider the evidence regarding the conduct of Dr. Canfield and Dr. Hart, along with all other evidence in the case, in determining whether or not Mr. Misasi complied with the applicable standard of care.

CP at 266; RP at 1433-34.

After respondents rested their case, appellants moved unsuccessfully for judgment as a matter of law, arguing the expert testimony did not prove factual cause. After the close of evidence, respondents requested the trial court instruct the jury on a medical patient's lost chance of survival. Respondents argued they did not have to plead a lost chance of survival as a cause of action because it was merely an element of damages in their wrongful death claim based on medical negligence.

The trial court ruled by e-mail, "In the context of this evidence, a loss of chance instruction is appropriate." CP at 233. The court partly reasoned, "When viewed as an element of damages, . . . it was not necessary to plead loss of chance as a cause of action, and . . . the parties addressed the [lost chance] issue (if under other terminology) on both sides of the case." CP at 233. Later, the court orally adhered to this e-mail, explaining the lost chance doctrine applies where the chance lost is less than or equal to 50 percent but traditional tort principles apply where the chance lost is greater than 50 percent.

6

The lost chance instruction reads,

If you find that Defendant Robert Masasi [sic] failed to comply with the applicable standard of care and was therefore negligent, you may consider whether or not his negligence proximately caused damages to Ruth Dormaier in the nature of loss or diminution of a chance to survive the condition which caused her death.

If you find that such negligence proximately caused a loss or diminution of a chance to survive, then you will determine the magnitude of the loss or diminution by comparing two percentages: (1) Ruth Dormaier's chance of surviving the condition which caused her death as it would have been had defendant not been negligent, and (2) the chance of surviving as affected by any negligence you find on the part of defendant.

The difference in the two percentages, if any you find, is the percentage of loss or diminution in the chance of survival. If you find that the loss or diminution of a chance to survive was in excess of 50%, then you have found that such negligence was a proximate cause of the death.

On the other hand, if you find that the loss or diminution of a chance to survive was less than 50%, then any damages you find to have been experienced because of the death of Ruth Dormaier will be reduced by multiplying the total damages by the percentage of loss or diminution in the chance of survival.

CP at 273; RP at 1438-39.

The jury returned the following special verdict:

**QUESTION 1: Was defendant Robert Misasi negligent?**
    **ANSWER:** ___Yes___ (write "yes" or "no")

*INSTRUCTION: If you answered "no" to Question 1, do not answer any other questions; sign this verdict form and notify the bailiff. If you answered "yes" to Question 1, proceed to Question 2.*

**QUESTION 2: Was the defendant's negligence a proximate cause of the death of Ruth M. Dormaier?**
    **ANSWER:** ___No___ (write "yes" or "no")

*INSTRUCTION: If you answered "no" to Question 2, proceed to Question 3. If you answered "yes" to Question 2, do not answer Question 3 or 4; proceed to Question 5.*

7

**QUESTION 3:** **Was the defendant's negligence a proximate cause of a loss or diminution of Ruth M. Dormaier's chance to survive the condition which caused her death?**
**ANSWER:** ___Yes___ (write "yes" or "no")

*INSTRUCTION: If you answered "no" to Question 3, do not answer any other questions; sign this verdict form and notify the bailiff. If you answered "yes" to Question 3, proceed to Question 4.*

**QUESTION 4:** **What do you find to be the percentage of loss or diminution in Ruth M. Dormaier's chance to survive proximately caused by the negligence of defendant?**
**ANSWER:** ___70%___ (write a percentage)

*INSTRUCTION: Proceed to Question 5.*

**QUESTION 5:** **What do you find to be the plaintiffs' amount of damages?**
**ANSWER:** **Estate of Ruth M. Dormaier:** $ ___20,481.22___

**Lourence C. Dormaier:** $ ___1,300,000.00___

*INSTRUCTION: Proceed to Question 6.*

**QUESTION 6:** **Was Robert Misasi the apparent agent of Samaritan Hospital?**
**ANSWER:** ___Yes___ (write "yes" or "no")

*INSTRUCTION: Sign this verdict form and notify the bailiff.*

CP at 357-58. At least 10 polled jurors ratified each answer. Appellants unsuccessfully requested a favorable judgment or limited judgment award.[5]

First, appellants sought entry of judgment in their favor upon the special verdict, arguing that in light of the lost chance instruction, an irreconcilable inconsistency existed between answer 2, which found Mr. Misasi's negligence did not proximately cause Mrs.

---

[5] The trial court later noted, "Defendants did not expressly move for judgment as a matter of law." CP at 1257.

Dormaier's death, and answer 4, which found Mr. Misasi's negligence proximately caused Mrs. Dormaier a 70 percent loss in her chance of survival. The trial court concluded that because a lost chance of survival was a different injury from death, "It was . . . not inconsistent with the jury's rejection of negligence as a proximate cause of the death itself, for the jury to consider the percentage by which negligence diminished Mrs. Dormaier's chance to survive the death-causing event." CP at 1257.

Second, appellants sought a judgment award limited to the estate's damages, arguing Mr. Dormaier could not recover individual damages for Mrs. Dormaier's lost chance of survival because the measure of damages instruction limited his individual compensation to damages resulting from her death. The trial court concluded the special verdict "entitles the plaintiff to a judgment for the full amount of the jury's award." RP (Apr. 6, 2012) at 14.

Finally, appellants sought a judgment award limited to 70 percent of both respondents' damages, arguing that because Mrs. Dormaier sustained a 70 percent loss in her chance of survival, respondents could recover no more than a proportional percentage of damages as compensation. The trial court concluded,

> Had the jury found that the diminution of chance to survive was less than 50%, then the court would have been required to reduce the jury's finding of damages by that figure. However, where the reduction in chance to survive is itself found to be greater than 50%, it becomes, as a matter of law, a concurrent proximate cause of the death (or, of the "failure to survive").

9

CP at 1257-58. Accordingly, the trial court entered a $1,320,481.22 judgment for respondents without applying a 30 percent reduction. Mr. Misasi and Samaritan Hospital appealed.

## ANALYSIS

### A. Lost Chance Instruction

The issue is whether the trial court erred in instructing the jury on a medical patient's lost chance of survival. We consider this instruction's historical background and our review standards before considering three questions:

(1) May a plaintiff argue the lost chance doctrine where the defendant's negligence reduced the decedent's chance of survival by greater than 50 percent?
(2) Does substantial evidence support a lost chance instruction here?
(3) Did respondents need to plead a lost chance of survival as a separate cause of action?

In *Herskovits v. Group Health Cooperative of Puget Sound*, 99 Wn.2d 609, 634, 664 P.2d 474 (1983) (Pearson, J., concurring), a plurality of our Supreme Court recognized a medical patient's lost chance of survival as an actionable injury under the wrongful death statute, RCW 4.20.010. The plaintiff alleged the defendant's negligent failure to diagnose the decedent's lung cancer "led to and caused his death." *Herskovits*, 99 Wn.2d at 620 (Pearson, J., concurring). But the plaintiff could not prove the decedent probably would have survived but for the defendant's negligence. *Id.* at 621. Rather, expert testimony merely showed the defendant's negligence reduced the decedent's chance of survival from 39 to 25 percent. *Id.* at 621-22. Our Supreme Court reversed summary judgment dismissal, *id.* at 619 (Dore, J., lead opinion); *id.* at 634,

10

636 (Pearson, J., concurring), with a plurality concluding "the loss of a less than even chance is a loss worthy of redress," *id.* at 634 (Pearson, J., concurring).

In *Mohr v. Grantham*, 172 Wn.2d 844, 850, 856-57, 859, 262 P.3d 490 (2011), our Supreme Court formally adopted the *Herskovits* plurality's reasoning and extended it to a lost chance of a better outcome under the medical malpractice statutes, chapter 7.70 RCW. The plaintiffs alleged the defendants' negligent treatment reduced the patient's chance of recovering from a stroke. *Id.* at 849. Expert testimony showed if the defendants had followed the applicable standard of care, the patient probably would have had a 50 to 60 percent chance of less or no disability. *Id.* at 849, 859-60. Our Supreme Court reversed summary judgment dismissal, finding "on this evidence, a prima facie showing of duty, breach, injury in the form of a lost chance, and causation." *Id.* at 860, 862.

*Herskovits* and *Mohr* establish a medical patient's lost chance of survival or a better outcome as an injury distinct from death or disability but nonetheless actionable under the wrongful death and medical malpractice statutes. *See* 99 Wn.2d at 634-35 (Pearson, J., concurring); 172 Wn.2d at 852, 857, 859. Consistent with traditional tort principles, the lost chance doctrine requires the plaintiff to prove the defendant breached a duty owed to the patient and, thereby, proximately caused the patient to lose a chance of survival or a better outcome. *Herskovits*, 99 Wn.2d at 631-32, 634-35 (Pearson, J., concurring); *Mohr*, 172 Wn.2d at 857. But the lost chance doctrine allows some recovery even where traditional tort principles would not. RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 26 cmt. n (2010); Joseph H.

11

No. 30864-2-III, *consol. with* No. 30865-1-III
*Estate of Dormaier v. Columbia Basin Anesthesia, PLLC*

King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 YALE L.J. 1353, 1363-64, 1376-78 (1981).

Because a plaintiff must prove proximate cause by a "'probably' or 'more likely than not'" standard, traditional tort principles would require the plaintiff to prove loss of a chance greater than 50 percent. *Herskovits*, 99 Wn.2d at 623, 631-33 (Pearson, J., concurring); RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 26 cmt. n; King, *supra*, 90 YALE L.J. at 1367. Where the plaintiff proved this percentage, he or she recovered all damages and where the plaintiff did not prove this percentage, he or she recovered nothing. *Herskovits*, 99 Wn.2d at 633 (Pearson, J., concurring); RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 26. cmt. n; King, *supra*, 90 YALE L.J. at 1367.

Under the lost chance doctrine, however, a plaintiff may recover something even if he or she proves loss of a chance less than or equal to 50 percent. *Herskovits*, 99 Wn.2d at 634-35 (Pearson, J., concurring); RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 26 cmt. n; King, *supra*, 90 YALE L.J. at 1363-64, 1376-78. Specifically, the plaintiff may recover solely a percentage of total damages proportional to the chance lost:

> "Rather than full damages for the adverse outcome, the plaintiff is only compensated for the lost opportunity. The lost opportunity may be thought of as the adverse outcome discounted by the difference between the ex ante probability of the outcome in light of the defendant's negligence and the probability of the outcome absent the defendant's negligence."

12

No. 30864-2-III, *consol. with* No. 30865-1-III
*Estate of Dormaier v. Columbia Basin Anesthesia, PLLC*

*Mohr*, 172 Wn.2d at 858 (quoting RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR

PHYSICAL AND EMOTIONAL HARM § 26 cmt. n; *see also Herskovits*, 99 Wn.2d at 635

(Pearson, J., concurring) (quoting King, *supra*, 90 YALE L.J. at 1382).

Here, the trial court instructed the jury on a medical patient's lost chance of

survival after deciding:

> (1) where the defendant's negligence reduced the decedent's chance of survival by less than or equal to 50 percent, the loss of a chance is the injury and the plaintiff receives proportional compensation under the lost chance doctrine, but where the defendant's negligence reduced the decedent's chance of survival by greater than 50 percent, as a matter of law, the death remains the injury and the plaintiff receives all-or-nothing recovery under traditional tort principles;
> (2) the evidence supported a lost chance instruction; and
> (3) respondents did not have to plead a lost chance of survival as a separate cause of action because it was part of their wrongful death claim based on medical negligence.

We review a decision on whether to give a requested jury instruction for abuse of

discretion if based on the trial court's view of the facts and de novo if based on the trial

court's view of the law.[6] *State v. Lucky*, 128 Wn.2d 727, 731, 912 P.2d 483 (1996),

*overruled on other grounds by State v. Berlin*, 133 Wn.2d 541, 544, 947 P.2d 700

(1997). Therefore, we review the trial court's first and third decisions de novo, and

second decision for abuse of discretion. *See id.* The sections below address each

decision separately.

---

[6] A trial court abuses its discretion if its decision is "manifestly unreasonable," based on "untenable grounds," or made for "untenable reasons." *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971); *see also In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997) ("A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the

13

### 1. Lost Chance Percentage

Appellants contend where the defendant's negligence reduced the decedent's chance of survival by greater than 50 percent, the plaintiff may not argue the lost chance doctrine because traditional tort principles provide exclusive relief in these cases.[7] Alternatively, appellants contend a plaintiff who proves such a loss may recover no more than a proportional percentage of damages compensating the chance lost. Respondents contend a plaintiff may argue the lost chance doctrine in these cases and recover all damages otherwise available under traditional tort principles. The dispute turns on the effect of *Herskovits* and *Mohr*. We interpret and apply judicial opinions de novo. *State v. Willis*, 151 Wn.2d 255, 261, 87 P.3d 1164 (2004).

First, the parties dispute the meaning of the *Herskovits* plurality's holding that "the best resolution of the issue before us is to recognize the loss of a less than even chance as an actionable injury." 99 Wn.2d at 634 (Pearson, J., concurring). Context indicates the plurality limited the lost chance doctrine to cases where the defendant's negligence reduced the decedent's chance of survival by less than or equal to 50

---

record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard.").

[7] Similarly, appellants contend where the defendant's negligence reduced the decedent's chance of survival to zero, the plaintiff may not argue the lost chance doctrine because traditional tort principles provide exclusive relief in these cases as well. We dismiss appellants' contention because it overemphasizes the ending percentage. For example, in *Herskovits*, it would have made no legal difference whether the defendant's negligence had reduced the decedent's chance of survival from 14 to zero percent instead of from 39 to 25 percent. Either way, the decedent lost a 14 percent chance of survival and our Supreme Court has emphatically declared this loss merits redress. *See Herskovits*, 99 Wn.2d at 634-35 (Pearson, J., concurring); *Mohr*, 172 Wn.2d at 852, 857, 859. Because each loss is just as quantifiable as the other, any purported distinction between them is artificial.

14

percent. The plurality began with the dilemma that the plaintiff could not prove wrongful death causation by a 'probably' or 'more likely than not' standard because the defendant's negligence reduced the decedent's chance of survival by just 14 percent, not 51 percent. *Id.* at 622-23, 633. For the plurality, the solution turned on whether it defined the decedent's injury as his death or as a reduction in his chance to survive his death-causing condition. *Id.* at 623-24. After reviewing judicial opinions from other jurisdictions, the plurality noted,

> The three cases where the chance of survival was greater than 50 percent . . . are unexceptional in that they focus on the *death* of the decedent *as the injury,* and they require *proximate cause* to be shown *beyond the balance of probabilities.* Such a result is *consistent with existing principles in this state* . . . .

*Id.* at 631 (emphasis added). Thus, the plurality thought a greater than 50 percent reduction in the decedent's chance of survival was the same as proximate cause of the decedent's death under traditional tort principles. *See id.*

Finally, rejecting all-or-nothing recovery in favor of proportional compensation, the *Herskovits* plurality held "the best resolution of the issue before us is to recognize the loss of a less than even chance as an actionable injury." *Id.* at 632-34. By reconceptualizing the decedent's injury as a reduction in his chance to survive his death-causing condition, the plurality concluded the plaintiff could now prove wrongful death causation in the form of a reduced chance of survival by a 'probably' or 'more likely that not' standard. *Id.* The plurality noted it derived this reconceptualization from a "liberal construction" of the wrongful death statute. *Id.* at 635 n.1. "Under this interpretation," the plurality explained, "a person will 'cause' the death of another person

15

(within the meaning of RCW 4.20.010) whenever he causes a substantial reduction in that person's chance of survival." *Id.* at 634-35.

Second, the parties dispute the meaning of the *Mohr* court's holding that "*Herskovits* applies to lost chance claims where the ultimate harm is some serious injury short of death." 172 Wn.2d at 857. Context indicates the court did not expand the lost chance doctrine to losses greater than 50 percent. The court began by formally adopting the *Herskovits* plurality's reasoning and extending it to a lost chance of a better outcome under the medical malpractice statutes. *Id.* at 850, 856-57. Then, the court reversed summary judgment upon expert testimony showing if the defendants had followed the applicable standard of care, the patient probably would have had a 50 to 60 percent chance of less or no disability. *Id.* at 849, 859-60, 862. The court reasoned this evidence established a prima facie medical malpractice claim, including causation. *Id.* at 860, 862.

But the *Mohr* court did not specify whether the plaintiff could argue the lost chance doctrine upon the 51 to 60 percent figures as well as the 50 percent figure. Because the 51 to 60 percent figures rose above the balance of probabilities, they constituted prima facie evidence of causation under traditional tort principles. Because the 50 percent figure fell below the balance of probabilities, it constituted prima facie evidence of causation under the lost chance doctrine.

We conclude the *Herskovits* plurality and *Mohr* court intended the lost chance doctrine to reconceptualize the decedent's injury and aid the plaintiff in proving wrongful death causation solely where the plaintiff cannot do so under traditional tort principles,

16

that is, where the defendant's negligence reduced the decedent's chance of survival by less than or equal to 50 percent. Logic compels our conclusion because where the loss is greater than 50 percent, no "separate and distinguishable harm" exists. *Daugert v. Pappas*, 104 Wn.2d 254, 261, 704 P.2d 600 (1985). As a matter of law, a greater than 50 percent reduction in the decedent's chance of survival is the same as proximate cause of the decedent's death under traditional tort principles. *See Herskovits*, 99 Wn.2d at 631 (Pearson, J., concurring).

Our conclusion preserves what we believe has become common understanding. *See Koker v. Armstrong Cork, Inc.*, 60 Wn. App. 466, 482, 804 P.2d 659 (1991) (stating the lost chance doctrine applies where the plaintiff "lost an opportunity *and has no other redress*"); *Sorenson v. Raymark Indus., Inc.*, 51 Wn. App. 954, 957, 756 P.2d 740 (1988) (same); 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 4.10, at 156 (3d ed. 2006) (stating the lost chance doctrine should apply solely where the plaintiff "has no other means of redress for his condition"). Many commentators have argued cogently for completely supplanting the all-or-nothing recovery of traditional tort principles with the proportional compensation of the lost chance doctrine, even where the chance lost is greater than 50 percent. *E.g.*, King, *supra*, 90 YALE L.J. at 1387; Joseph H. King, Jr., *"Reduction of Likelihood" Reformulation and Other Retrofitting of the Loss-of-a-Chance Doctrine*, 28 U. MEM. L. REV. 491, 556-57 (1998); David A. Fischer, *Tort Recovery for Loss of a Chance*, 36 WAKE FOREST L. REV. 605, 619 (2001). While logical, such a task is best left to our Supreme Court or legislature.

17

Considering all, we adopt the trial court's reasoning and hold where the defendant's negligence reduced the decedent's chance of survival by less than or equal to 50 percent, the loss of a chance is the injury and the plaintiff receives proportional compensation under the lost chance doctrine, but where the defendant's negligence reduced the decedent's chance of survival by greater than 50 percent, as a matter of law, the death remains the injury and the plaintiff receives all-or-nothing recovery under traditional tort principles. Thus, a plaintiff may not argue the lost chance doctrine where the defendant's negligence reduced the decedent's chance of survival by greater than 50 percent. We next apply this holding to our facts.

## 2. Substantial Evidence

Appellants contend the trial court erred in finding the evidence supported instructing the jury on a medical patient's lost chance of survival. We review a trial court's decision on whether evidence supports a jury instruction for abuse of discretion. *See State v. Walker*, 136 Wn.2d 767, 771-72, 777, 966 P.2d 883 (1998).

A trial court must instruct the jury on a party's case theory if substantial evidence supports it. *Kelsey v. Pollock*, 59 Wn.2d 796, 798-99, 370 P.2d 598 (1962). Substantial evidence is a "sufficient quantum to persuade a fair-minded, rational person of the truth of a declared premise." *Helman v. Sacred Heart Hosp.*, 62 Wn.2d 136, 147, 381 P.2d 605 (1963). Evidence supporting a party's case theory "must rise above speculation and conjecture" to be substantial. *Bd. of Regents of Univ. of Wash. v. Frederick & Nelson*, 90 Wn.2d 82, 86, 579 P.2d 346 (1978).

18

As analyzed above, a trial court may instruct the jury on a medical patient's lost chance of survival if the evidence shows the defendant's negligence reduced the decedent's chance of survival by less than or equal to 50 percent. *See also Zueger v. Pub. Hosp. Dist. No. 2 of Snohomish County*, 57 Wn. App. 584, 591, 789 P.2d 326 (1990); *Herskovits*, 99 Wn.2d at 631-32, 634-35 (Pearson, J., concurring). This lost chance "'may be thought of as the adverse outcome discounted by the difference between the ex ante probability of the outcome in light of the defendant's negligence and the probability of the outcome absent the defendant's negligence.'" *Mohr*, 172 Wn.2d at 858 (quoting RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM § 26 cmt. n). And, this calculation "is based on expert testimony, which in turn is based on significant practical experience and 'on data obtained and analyzed scientifically . . . as part of the repertoire of diagnosis and treatment, as applied to the specific facts of the plaintiff's case.'" *Id.* at 857-58 (omission in original) (quoting *Matsuyama v. Birnbaum*, 452 Mass. 1, 17, 890 N.E.2d 819 (2008)).

Appellants argue the expert testimony dealt solely with death, omitted percentages showing Mrs. Dormaier's chance of survival with and without Mr. Misasi's negligence, or was too abstract. However, Dr. Swenson testified a patient presenting symptoms of a pulmonary embolus and no complicating terminal illness will have about a 90 percent chance of survival if properly diagnosed and treated. He explained properly diagnosing and treating a pulmonary embolus may reduce patient mortality from 70 or 80 percent to 10 or 20 percent, which the jury could reasonably infer increases patient survival from 20 or 30 percent to 80 or 90 percent. Then, noting Mrs.

19

Dormaier presented symptoms of a pulmonary embolus and no complicating terminal illness, Dr. Swenson concluded she would have had a 90 percent chance of survival if properly diagnosed and treated. From this conclusion, the jury could reasonably infer all previously stated percentages applied to Mrs. Dormaier.

The expert testimony rises above speculation and conjecture, and is sufficient to persuade a fair-minded, rational person that Mr. Misasi's negligent decision to anesthetize Mrs. Dormaier instead of refer her for proper care reduced her chance of survival by 50 to 70 percent. Because the 51 to 70 percent figures rise above the balance of probabilities, they constitute substantial evidence to support respondents' case theory under traditional tort principles. Because the 50 percent figure falls below the balance of probabilities, it constitutes substantial evidence to support respondents' case theory under the lost chance doctrine. Therefore, the trial court did not abuse its discretion in finding the evidence supported a lost chance instruction.

### 3. Pleading Requirements

Appellants contend the trial court erred in concluding respondents did not have to plead a lost chance of survival as a separate cause of action because it was part of their wrongful death claim based on medical negligence. We interpret and apply CR 8 pleading requirements de novo. *See Nevers v. Fireside, Inc.*, 133 Wn.2d 804, 809, 947 P.2d 721 (1997); *In re Firestorm 1991*, 129 Wn.2d 130, 135, 916 P.2d 411 (1996).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." CR 8(a). We construe a complaint liberally so as to do substantial justice. CR 8(f); *State v. Adams*, 107 Wn.2d 611, 620, 732 P.2d 149 (1987).

20

"If a complaint states facts entitling the plaintiff to some relief, it is immaterial by what name the action is called." *Adams*, 107 Wn.2d at 620. But a complaint should adequately alert the defendant of the claim's general nature. *State v. Ralph Williams' Nw. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 315, 553 P.2d 423 (1976). While a complaint may contain inexpert pleading, it may not contain insufficient pleading. *Lewis v. Bell*, 45 Wn. App. 192, 197, 724 P.2d 425 (1986). A complaint is insufficient if it does not give the defendant "fair notice of what the claim is and the ground upon which it rests." *Williams v. W. Sur. Co.*, 6 Wn. App. 300, 305-06, 492 P.2d 596 (1972). Thus, a complaint must identify the legal theory upon which the plaintiff seeks relief. *Dewey v. Tacoma Sch. Dist. No. 10*, 95 Wn. App. 18, 23, 25-26, 974 P.2d 847 (1999).

Appellants argue the *Mohr* court intended to set the loss of a chance apart as an autonomous cause of action, claim, or other ground for relief. We disagree. The *Herskovits* plurality recognized a lost chance of survival as an "actionable injury"[8] under the wrongful death statute, actionable through a wrongful death claim based on medical negligence. 99 Wn.2d at 634 (Pearson, J., concurring). Our Supreme Court soon called the loss of a chance an "analysis." *Daugert*, 104 Wn.2d at 262. Then, the *Mohr* court equivocally labeled the loss of a chance as a "cause of action,"[9] "claim,"[10] "case,"

---

[8] An injury is "[t]he violation of another's legal right, for which the law provides a remedy; . . . an actionable invasion of a legally protected interest." BLACK'S LAW DICTIONARY 856 (9th ed. 2009).

[9] A cause of action is "[a] legal theory of a lawsuit" or "[a] group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person." *Id.* at 251.

[10] A claim is "[t]he aggregate of operative facts giving rise to a right enforceable by a court." *Id.* at 281-82.

"doctrine," "theory," and "rule." 172 Wn.2d 844 *passim.*

While confusing, the *Mohr* court's labels are not determinative because that case did not decide how to classify a lost chance of survival for CR 8 pleading purposes. *Id.* at 850. Overall, the *Mohr* court reaffirmed a lost chance of survival is fundamentally an alternative manner of proving wrongful death causation, available solely where the defendant's negligence reduced the decedent's chance of survival by less than or equal to 50 percent. *See id.* at 850-57; *see also Herskovits*, 99 Wn.2d at 634-35 (Pearson, J., concurring) ("[T]he best resolution of the issue before us is to recognize the loss of a less than even chance as an actionable injury. . . . [A] person will 'cause' the death of another person (within the meaning of RCW 4.20.010) whenever he causes a substantial reduction in that person's chance of survival."). Indeed, recovery for a lost chance of survival is endemic in a wrongful death claim based on medical negligence. *See Herskovits*, 99 Wn.2d at 623-24, 631-35 (Pearson, J., concurring).

Nothing suggests the *Mohr* court intended to set the loss of a chance apart as an autonomous cause of action, claim, or ground for relief. And, two considerations suggest our Supreme Court could not or would not do so anyway. First, the right to sue for damages resulting from death did not exist at common law and is strictly statutory. *Huntington v. Samaritan Hosp.*, 101 Wn.2d 466, 470 & n.1, 680 P.2d 58 (1984); *Hedrick v. Ilwaco Ry. & Navigation Co.*, 4 Wash. 400, 402, 30 P. 714 (1892), *overruled on other grounds by Lockhart v. Besel*, 71 Wn.2d 112, 426 P.2d 605 (1967). Second, the wrongful death statute created a single cause of action. *Mills v. Inter Island Tel. Co.*, 68 Wn.2d 820, 831, 416 P.2d 115 (1966); *Riggs v. N. Pac. Ry.*, 60 Wash. 292, 294, 111 P.

22

162 (1910). "The formulation of a new policy with regard to this statutory cause of action is the responsibility of the Legislature, not a task for this court." *Huntington*, 101 Wn.2d at 470; *accord Atchison v. Great W. Malting Co.*, 161 Wn.2d 372, 381, 166 P.3d 662 (2007); *Philippides v. Bernard*, 151 Wn.2d 376, 390, 88 P.3d 939 (2004).

Respondents' "COMPLAINT FOR WRONGFUL DEATH" alleged Mrs. Dormaier "died as a proximate result of the negligence of the Defendants" and "sustained injuries and damages and died due to the negligence of Defendants." CP at 4, 9. The complaint stated a wrongful death claim based on medical negligence, specifying Mr. Misasi's decision to anesthetize Mrs. Dormaier instead of refer her for proper care "was a proximate cause of the injury and death to [her]." CP at 10. These facts, if proved, would entitle respondents to some relief under the wrongful death statute, through either the lost chance doctrine or traditional tort principles. *See Herskovits*, 99 Wn.2d at 620 (Pearson, J., concurring) (quoting the complaint's allegation that the defendant's negligent failure to diagnose the decedent's lung cancer "led to and caused his death"); *Adams*, 107 Wn.2d at 620.

But wrongful death remained the legal theory upon which respondents sought relief. *See Dewey*, 95 Wn. App. at 23, 25-26. Thus, it is immaterial whether the complaint expressly named the lost chance injury. *See Adams*, 107 Wn.2d at 620. Even so, the complaint notified appellants of the wrongful death claim based on medical negligence and related various resulting injuries. *See Ralph Williams'*, 87 Wn.2d at 315. Therefore, the complaint gave appellants fair notice of the claim and its grounds. *See Williams*, 6 Wn. App. at 305-06; *Lewis*, 45 Wn. App. at 197.

23

Our conclusion is bolstered by decisions from other jurisdictions that have followed *Herskovits* and adopted a lost chance as the law of the state. None of these other courts have held a lost chance is a new cause of action. To the contrary, in *Baer v. Regents of the University of California*, 126 N.M. 508, 513, 972 P.2d 9 (1998), the New Mexico Court of Appeals declared the lost chance doctrine "does not require recognition of a new cause of action." In *Poulin v. Yasner*, 64 Conn. App. 730, 744, 781 A.2d 422 (2001), the Connecticut Appellate Court agreed with the trial court that the plaintiff did not need to expressly plead a lost chance injury. In *Roberts v. Ohio Permanente Medical Group, Inc.*, 76 Ohio St. 3d 483, 668 N.E.2d 480 (1996), the Ohio Supreme Court concluded recovery for a lost chance of survival was viable where the plaintiff pleaded only wrongful death based on medical malpractice. *See also Wendland v. Sparks*, 574 N.W.2d 327, 329 (Iowa Ct. App. 1998) (concluding a plaintiff need not plead a lost chance theory to avail himself or herself of such a claim in a wrongful death action based on medical malpractice); *Powell v. St. John Hosp.*, 241 Mich. App. 64, 76, 614 N.W.2d 666 (2000) (concluding the plaintiff was not required to plead the lost chance doctrine because it was not a separate theory of recovery from the plaintiff's medical malpractice claim alleging wrongful death).

Accordingly, the trial court properly concluded respondents did not have to plead a lost chance of survival as a separate cause of action because it was part of their

wrongful death claim based on medical negligence.[11] In sum, the trial court did not err

in instructing the jury on a medical patient's lost chance of survival.

## B. Fault Allocation Rulings

The issue is whether appellants preserved their error claims regarding the trial

court's fault allocation rulings or, alternatively, whether any such error was harmless.

Appellants contend the court erred in ruling res judicata precluded them from allocating

fault to Drs. Canfield and Hart as nonparties previously dismissed on summary

judgment. Respondents contend appellants did not preserve their error claims but,

even so, any error was harmless. We may affirm on any ground the record is

"sufficiently developed to fairly consider." RAP 2.5(a). We will not reverse unless an

error prejudiced a party because it "affects, or presumptively affects, the outcome of the

trial." *Brown v. Spokane County Fire Prot. Dist. No. 1*, 100 Wn.2d 188, 196, 668 P.2d

571 (1983). We review de novo whether a defendant improperly invoked the fault

allocation procedure or waived a pleaded affirmative defense. *See King v. Snohomish

County*, 146 Wn.2d 420, 424-25, 47 P.3d 563 (2002); *Adcox v. Children's Orthopedic

Hosp. & Med. Ctr.*, 123 Wn.2d 15, 24-29, 864 P.2d 921 (1993).

---

[11] Moreover, by finding "the parties addressed the [lost chance] issue (if under other terminology) on both sides of the case," CP at 233, the trial court apparently treated the pleadings as amended to conform to the lost chance evidence presented at trial, *see Stueckle v. Sceva Steel Bldgs., Inc.*, 1 Wn. App. 391, 392, 461 P.2d 555 (1969). The court did not abuse its discretion in doing so because appellants failed to object to the lost chance evidence for raising an issue outside the pleadings, failed to request a trial continuance, and failed to request a reopening of the evidence before the jury began deliberating. *See* CR 15(b); ER 103(a)(1); *Reichelt v. Johns-Manville Corp.*, 107 Wn.2d 761, 766-67, 733 P.2d 530 (1987); *Daves v. Nastos*, 105 Wn.2d 24, 27, 711 P.2d 314 (1985) (citing *V.C. Edwards Contracting Co. v. Port of Tacoma*, 83 Wn.2d 7, 14, 514 P.2d 1381 (1973)).

As amended, the Tort Reform Act of 1986 partly provides, "In all actions involving fault of more than one entity, the trier of fact shall determine the percentage of the total fault which is attributable to every entity which caused the claimant's damages . . . ." RCW 4.22.070(1). Entities include "defendants," such as Mr. Misasi and Samaritan Hospital, and nonparties with "any other individual defense against the claimant," such as Drs. Canfield and Hart. *Id.* Fault means "acts or omissions . . . that are in any measure negligent or reckless." RCW 4.22.015.

A defendant must properly invoke RCW 4.22.070(1)'s fault allocation procedure because it "is not self-executing" and "does not automatically apply to each case where more than one entity could theoretically be at fault." *Adcox*, 123 Wn.2d at 25-26. Thus, a defendant must plead nonparty fault as an affirmative defense. CR 8(c), 12(i); *Henderson v. Tyrrell*, 80 Wn. App. 592, 623-24, 910 P.2d 522 (1996). But a defendant may waive a pleaded affirmative defense under some circumstances. *See King*, 146 Wn.2d at 424-25; 14 KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 12:17, at 489 (2d ed. 2009). Specifically, a defendant may waive an affirmative defense as a matter of law if "the defendant's assertion of the defense is inconsistent with the defendant's previous behavior" or "the defendant's counsel has been dilatory in asserting the defense." *Lybbert v. Grant County*, 141 Wn.2d 29, 38-39, 1 P.3d 1124 (2000).

Respondents' complaint originally named Drs. Canfield and Hart as defendants while Mr. Misasi and Samaritan Hospital's answers each pleaded nonparty fault as an affirmative defense. But when Drs. Canfield and Hart moved for summary judgment

dismissal of respondents' claims against them, no party opposed the motion. Then, in their trial briefs, appellants introduced their case theory that Drs. Canfield and Hart were not negligent and, because Mr. Misasi relied on them and acted jointly with them as part of a team, he was not negligent either. Through motions in limine 1 and 14, respondents sought to prohibit appellants from allocating fault to Drs. Canfield and Hart. While appellants asked the trial court to defer ruling on the motions, our record shows numerous instances where they specifically and consistently stated their intent not to paint Drs. Hart and Canfield as negligent, in other words, not to allocate fault to them.

For example, in a joint memorandum, appellants said, "At this juncture, Defendants do not intend to paint the care of Drs. Hart and Canfield as negligent. On the contrary, Defendants contend that no party was negligent." CP at 748. At a hearing, appellants said,

> I suspect that it's about a 99 percent chance we're not going to apportion fault.
> . . . .
> . . . I don't think I'm going to apportion fault to either of these gentlemen . . . .
> . . . I don't think I'm going to apportion fault to Dr. Hart and Dr. Canfield. On the contrary, I think the position of Mr. Misasi, of the hospital is that none of the people involved in this case were negligent, including Mr. Misasi.
> . . . .
> . . . I don't anticipate anyone on the defense side saying that there was negligence committed by Dr. Hart . . . or by Dr. Canfield . . . because it is our position that the defendant, that all of the originally named defendants, none of them were negligent.

RP at 82, 105, 108-10. After the trial court granted motions in limine 1 and 14, the parties revisited the ruling several times during trial, when appellants said,

27

> I believe I stood up when we were arguing your ruling and said, I will –
> defendants will not apportion fault, we're not going to try to put Dr. Hart
> and Dr. Canfield on the verdict form.
>
> . . . .
>
> . . . I don't know that it makes a difference whether Dr. Hart and Dr.
> Canfield were negligent or not. I'm not going to apportion fault to them.
>
> . . . .
>
> . . . I'm not going to say they were negligent.
>
> . . . .
>
> . . . [M]y recollection of the ruling of the court was we could not apportion
> fault, we certainly aren't going to, we never were as to Dr. Canfield or Dr.
> Hart.

RP at 670-71, 678, 962. When the trial court decided to instruct the jury not to consider whether Drs. Canfield and Hart were negligent, Mr. Misasi objected, arguing the instruction was irrelevant.

Appellants' case theory argued Drs. Canfield and Hart were not negligent and, because he relied on them and acted jointly with them as part of a team, Mr. Misasi was not negligent either. Appellants elected this theory independently of the trial court's fault allocation rulings by introducing it in their trial briefs, which they filed 17 and 18 days, respectively, before the court granted motions in limine 1 and 14. Throughout the entire case, appellants deliberately avoided allocating fault to Drs. Canfield or Hart because doing so would undermine this theory. *See Adcox*, 123 Wn.2d at 28-29. Thus, after they pleaded nonparty fault as an affirmative defense in May and July 2009, respectively, appellants did not assert it again until filing their opening brief to this court in November 2012.

Asserting nonparty fault here is both dilatory and inconsistent with appellants' trial court behavior. *See King*, 146 Wn.2d at 424-25; *Lybbert*, 141 Wn.2d at 38-45.

Appellants' course of conduct as a whole waived the affirmative defense of nonparty fault. *See King*, 146 Wn.2d at 424-25; *Lybbert*, 141 Wn.2d at 38-45. Therefore, they did not properly invoke RCW 4.22.070(1)'s fault allocation procedure. *See* CR 8(c), 12(i); *Adcox*, 123 Wn.2d at 25-26; *Henderson*, 80 Wn. App. at 623-24. Even if we concluded otherwise, any error in the trial court's fault allocation rulings was harmless because, as the analysis above indicates, it did not affect or presumptively affect the trial outcome and, thus, did not prejudice appellants. *See Brown*, 100 Wn.2d at 196. In sum, appellants did not preserve their error claims regarding the trial court's fault allocation rulings and, alternatively, any error was harmless.

## C.  Judgment as a Matter of Law

The issue is whether the trial court erred in denying appellants' motion for judgment as a matter of law.[12] Appellants contend the expert testimony did not prove proximate cause, specifically factual cause. We review a decision on a motion for judgment as a matter of law de novo, applying the same standard as the trial court. *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 29, 948 P.2d 816 (1997); *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 187, 23 P.3d 440 (2001), *overruled on other grounds by McClarty v. Totem Elec.*, 157 Wn.2d 214, 137 P.3d 844 (2006).

Judgment as a matter of law is proper if "viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial

---

[12] Appellants additionally characterize this as a motion to dismiss for insufficient evidence under RCW 4.56.150. But the characterization does not alter our analysis. *See* 14A TEGLAND, *supra*, § 23:14, at 49-50 (stating a motion to dismiss for insufficient evidence under RCW 4.56.150 is "for all practical purposes, the equivalent of a motion

evidence or reasonable inference to sustain a verdict for the nonmoving party." *Sing*, 134 Wn.2d at 29 (citing *Indus. Indem. Co. of the Nw. v. Kallevig*, 114 Wn.2d 907, 915-16, 792 P.2d 520 (1990)); *see* CR 50(a)(1). Substantial evidence is a "sufficient quantum to persuade a fair-minded, rational person of the truth of a declared premise." *Helman*, 62 Wn.2d at 147. Evidence sustaining a verdict for the nonmoving party must "convince 'an unprejudiced, thinking mind'" to be substantial. *Indus. Indem.*, 114 Wn.2d at 916 (quoting *Hojem v. Kelly*, 93 Wn.2d 143, 145, 606 P.2d 275 (1980)). A motion for judgment as a matter of law "admits the truth of the [nonmoving party's] evidence and all inferences which can reasonably be drawn therefrom, and requires that the evidence be interpreted most strongly against the moving party and in a light most favorable to the [nonmoving party]." *Davis v. Early Constr. Co.*, 63 Wn.2d 252, 254, 386 P.2d 958 (1963). We, like the trial court, defer to the jury in matters of witness credibility and evidence weight or persuasiveness. *Faust v. Albertson*, 167 Wn.2d 531, 538, 222 P.3d 1208 (2009).

A wrongful death claim requires the plaintiff to prove the defendant breached a duty owed to the decedent and, thereby, proximately caused the decedent's death or lost chance of survival. *See* RCW 4.20.010; *Herskovits*, 99 Wn.2d at 631-32, 634-35 (Pearson, J., concurring); *Mohr*, 172 Wn.2d at 857. Under traditional tort principles, the death is the injury and the plaintiff must prove causation by a greater than 50 percent reduction in the decedent's chance of survival. *Supra* Part A.1. But under the lost chance doctrine, the loss of a chance is the injury and the plaintiff may prove causation

---

for judgment as a matter of law under CR 50" because "[t]he test . . . is the same" for

by a less than or equal to 50 percent reduction in the decedent's chance of survival. *Supra* Part A.1.

Standard proximate cause principles require the plaintiff to prove the defendant's breach of duty "was a cause in fact of the injury" and "as a matter of law liability should attach." *Harbeson v. Parke-Davis, Inc.*, 98 Wn.2d 460, 475-76, 656 P.2d 483 (1983) (citing *King v. City of Seattle*, 84 Wn.2d 239, 249, 525 P.2d 228 (1974)); *see also Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985). This case concerns factual cause solely. "Cause in fact refers to the 'but for' consequences of an act—the physical connection between an act and an injury." *Hartley*, 103 Wn.2d at 778. Thus, the plaintiff may prove factual cause by showing "but for the [defendant's] breach of duty, the injury would not have occurred." *Harbeson*, 98 Wn.2d at 476.

In an action for injury resulting from healthcare, the plaintiff generally must prove proximate cause by expert testimony. *McLaughlin v. Cooke*, 112 Wn.2d 829, 837, 774 P.2d 1171 (1989); *see* RCW 7.70.010, .040; *Harris v. Robert C. Groth, MD, Inc.*, 99 Wn.2d 438, 449, 663 P.2d 113 (1983). Expert testimony is insufficient to support a finding of proximate cause if, as a whole, it requires the jury to "resort to speculation and conjecture in determining [a] causal relationship." *O'Donoghue v. Riggs*, 73 Wn.2d 814, 824, 440 P.2d 823 (1968). Thus, expert testimony "must at least be sufficiently definite to establish that the act complained of 'probably' or 'more likely than not' caused the subsequent [injury]." *Id.* But expert testimony "is deemed based on speculation and

each).

31

conjecture if [it] does not go beyond the expression of an opinion that the [injury] 'might have' or 'possibly did' result from the hypothesized cause." *Id.*

Appellants argue the expert testimony merely established Mr. Misasi's negligence might have or possibly did cause Mrs. Dormaier's death or lost chance of survival. They complain the expert testimony lacked any opinion that, but for Mr. Misasi's negligent decision to anesthetize Mrs. Dormaier instead of refer her for proper care, Samaritan Hospital probably or more likely than not would have prevented her fatal pulmonary embolism. They emphasize the expert testimony did not say Samaritan Hospital would have had enough time or resources to diagnose and treat Mrs. Dormaier's pulmonary emboli or pelvic deep venous thrombosis if Mr. Misasi had followed the applicable standard of care.

We disagree because, viewing the opinions of Drs. Swenson, Hattamer, Reynolds, and Halpern in a light most favorable to respondents, the expert testimony shows:

- If a patient presents symptoms of a pulmonary embolus, performing a computed tomography (CT) scan can show the blood clot in the lungs' blood vessels. A CT scan is the most common method of revealing a pulmonary embolus. It has a 90 percent success rate and takes about an hour.
- Mrs. Dormaier presented symptoms of a pulmonary embolus and pelvic pain.
- Samaritan Hospital had a CT scanner and Mrs. Dormaier's medical records indicate she could have undergone a CT scan.
- Performing a CT scan would have revealed Mrs. Dormaier's pulmonary emboli or pelvic deep venous thrombosis.
- If a patient presents a confirmed blood clot, administering Heparin, an anticoagulant, can prevent additional clots from forming, prevent existing clots from growing and detaching, and promote dissolution of existing clots by allowing the body's natural mechanisms to operate unimpeded. Heparin is the fastest acting and most commonly used anticoagulant. It has a 90 percent success rate and takes hours or days.

- Administering Heparin would have significantly reduced Mrs. Dormaier's risk of a fatal pulmonary embolism.
- A patient presenting symptoms of a pulmonary embolus and no complicating terminal illness will have about a 90 percent chance of survival if properly diagnosed and treated. Properly diagnosing and treating a pulmonary embolus may reduce patient mortality from 70 or 80 percent to 10 or 20 percent, which the jury could reasonably infer increases patient survival from 20 or 30 percent to 80 or 90 percent.
- Mrs. Dormaier presented symptoms of a pulmonary embolus and no complicating terminal illness. She would have had a 90 percent chance of survival if properly diagnosed and treated. From this conclusion, the jury could reasonably infer all previously stated percentages applied to Mrs. Dormaier.
- Mrs. Dormaier's last pulmonary embolism was survivable and her death was preventable; the key was proper diagnosis and treatment. But "[t]aking her to the operating room was almost euthanizing her." RP at 395.
- Respondents' expert witnesses rendered each of the opinions above "to a reasonable degree of medical probability or certainty." RP at 260, 398, 604, 646, 925-26, 1166.

In sum, appellants' arguments mainly concern witness credibility and evidence weight or persuasiveness. We, like the trial court, defer to the jury on these matters. The expert testimony shows if Mr. Misasi had followed the applicable standard of care and referred Mrs. Dormaier for proper care, Samaritan Hospital would have diagnosed and treated her blood clot, and she would have had a chance of survival between 80 and 90 percent. Additionally, the expert testimony shows because Mr. Misasi negligently anesthetized Mrs. Dormaier, Samaritan Hospital did not diagnose and treat her blood clot, and she had a chance of survival between 20 and 30 percent. The expert testimony rises above speculation and conjecture, and is sufficient to persuade a fair-minded, rational person that Mr. Misasi's negligence probably or more likely than not caused Mrs. Dormaier a 50 to 70 loss in her chance of survival. Because the 51 to 70 percent figures rise above the balance of probabilities, they constitute substantial

33

evidence to support a proximate cause finding under traditional tort principles. Because the 50 percent figure falls below the balance of probabilities, it constitutes substantial evidence to support a proximate cause finding under the lost chance doctrine. Therefore, the trial court did not err in denying appellants' motion for judgment as a matter of law.

### D. Special Verdict Answers

The issue is whether the trial court erred by denying appellants' request for entry of judgment in their favor upon the special verdict. Appellants contend an irreconcilable inconsistency exists between answers 2 and 4 in light of the lost chance instruction. Because the trial court based its decision on its view of the special verdict's legal effect, we apply the de novo review standard. *See In re Registration of Elec. Lightwave, Inc.*, 123 Wn.2d 530, 536, 869 P.2d 1045 (1994) (stating an appellate court applies the de novo review standard to a decision upon a legal issue); *cf. Sing*, 134 Wn.2d at 29.

Once a jury renders a verdict, the trial court must declare its legal effect. *State v. Evans Engine & Equip. Co.*, 22 Wn. App. 202, 205-06, 589 P.2d 290 (1978); *Minger v. Reinhard Distrib. Co.*, 87 Wn. App. 941, 946, 943 P.2d 400 (1997); *see* CR 49, 58. A court liberally construes a verdict so as to discern and implement the jury's intent, if consistent with the law. *Wright v. Safeway Stores, Inc.*, 7 Wn.2d 341, 344, 109 P.2d 542 (1941) (citing *Cameron v. Stack-Gibbs Lumber Co.*, 68 Wash. 539, 544, 123 P. 1001 (1912)). A court may view a verdict in light of the jury instructions and trial evidence. *Meenach v. Triple "E" Meats, Inc.*, 39 Wn. App. 635, 639, 694 P.2d 1125 (1985); *Evans Engine & Equip.*, 22 Wn. App. at 206.

34

If special verdict answers conflict with each other, a court must atternpt to harmonize them; where the answers are reconcilable, the trial court must enter judgment accordingly and where the answers are irreconcilable, the trial court must order further deliberations or a new trial. *Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 136, 875 P.2d 621 (1994) (quoting *Blue Chelan, Inc. v. Dep't of Labor & Indus.*, 101 Wn.2d 512, 515, 681 P.2d 233 (1984)); 14A TEGLAND, *supra*, § 32:16, at 362 & n.2 (quoting *Haney v. Cheatham*, 8 Wn.2d 310, 325-26, 111 P.2d 1003 (1941)); *cf.* CR 49(b). But a court must not "substitute its judgment for that which is within the province of the jury." *Blue Chelan*, 101 Wn.2d at 515. Until a party proves otherwise, a court must presume the jury properly followed the instructions it received. *State v. Gay*, 82 Wash. 423, 428, 144 P. 711 (1914); *Bordynoski v. Bergner*, 97 Wn.2d 335, 342, 644 P.2d 1173 (1982). A court must order a new trial if a verdict indicates the jury disregarded its instructions. *Tincani*, 124 Wn.2d at 136 (citing *Nichols v. Lackie*, 58 Wn. App. 904, 907, 795 P.2d 722 (1990)).

In special verdict answer 4, the jury found Mr. Misasi's negligence proximately caused Mrs. Dormaier a 70 percent loss in her chance of survival. The lost chance instruction stated, "If you find that the loss or diminution of a chance to survive was in excess of 50%, then you have found that such negligence was a proximate cause of the death." CP at 273; RP at 1439. In special verdict answer 2, the jury wrote "No," finding Mr. Misasi's negligence did not proximately cause Mrs. Dormaier's death. Thus, answers 2 and 4 conflict with each other in light of the lost chance instruction.

35

Appellants argue this conflict is irreconcilable because the lost chance instruction prohibited the jury from finding a lost chance greater than 50 percent in answer 4 and required the jury to instead write "Yes" in answer 2. But the instruction used descriptive rather than prescriptive language. It did not expressly limit the scope of potential findings. It merely announced that finding a lost chance of survival greater than 50 percent would have the same legal effect as finding proximate cause of death. Because a lost chance of survival is an actionable injury distinct from death, *see Herskovits*, 99 Wn.2d at 634-35 (Pearson, J., concurring); *Mohr*, 172 Wn.2d at 852, 857, 859, the jury could generally find proximate cause of the former without finding proximate cause of the latter. Though the jury based respondents' recovery on the sole area of potential overlap between the lost chance doctrine and traditional tort principles, the lost chance instruction provides a workable basis for discerning and implementing the jury's intent. Thus, we can harmonize special verdict answers 2 and 4 in light of the lost chance instruction.[13] We agree with the trial court that writing "70%" in answer 4 had the same legal effect as writing "Yes" in answer 2. Therefore, the court did not err by denying appellants' request for entry of judgment in their favor upon the special verdict.

---

[13] Regardless, appellants waived their objection to the special verdict answers by failing to assert it before the trial court discharged the jury. *See Gjerde v. Fritzsche*, 55 Wn. App. 387, 393-94, 777 P.2d 1072 (1989); *Minger*, 87 Wn. App. at 946. To the extent appellants argue an inconsistency exists in the special verdict questions themselves, they waived this objection too by failing to assert it before the trial court discharged the jury. *See Lahmann v. Sisters of St. Francis of Phila.*, 55 Wn. App. 716, 723, 780 P.2d 868 (1989); *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 63, 882 P.2d 703, 891 P.2d 718 (1994). And, to the extent appellants argue the jury misunderstood or misapplied the lost chance instruction during deliberations, any misconduct or procedural irregularity inhered in the verdict after the trial court polled

### E. Damages

The issue is whether the trial court erred by denying appellants' request for a judgment award limited to the estate's damages or alternatively, 70 percent of both respondents' damages. Our review standard remains de novo. *See Elec. Lightwave*, 123 Wn.2d at 536; *cf. Sing*, 134 Wn.2d at 29.

First, appellants argue Mr. Dormaier may not recover individual damages for Mrs. Dormaier's lost chance of survival because the measure of damages instruction limited his individual compensation to damages resulting from her death. Indeed, the measure of damages instruction required the jury to award Mr. Dormaier individual compensation for "such damages as you find were proximately caused by the death of [Mrs.] Dormaier." CP at 274; RP at 1440. And indeed, a lost chance of survival is an actionable injury distinct from death. *See Herskovits*, 99 Wn.2d at 634-35 (Pearson, J., concurring); *Mohr*, 172 Wn.2d at 852, 857, 859. But we decline to read the measure of damages instruction hypertechnically.

Construing the relevant language along with the lost chance instruction, "death" here means the general fact Mrs. Dormaier has died. This fact underlies the lost chance doctrine as well as traditional tort principles. Damages for a lost chance of survival are partly defined and measured in terms of "death," specifically, "what would be compensable under the ultimate harm of death," *Mohr*, 172 Wn.2d at 858, or "'the compensable value of the victim's life had he survived,'" *Herskovits*, 99 Wn.2d at 635 (quoting King, *supra*, 90 YALE L.J. at 1382). Thus, the jury properly concluded the

the jury in open court. *See Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d

measure of damages instruction allowed it to award Mr. Dormaier individual compensation for damages resulting from Mrs. Dormaier's lost chance of survival. This award creates no redundancy because the lost chance doctrine is alternative to and provides different relief than traditional tort principles. Therefore, the trial court did not err by denying appellants' request for a judgment award limited to the estate's damages.

Second, appellants argue that because the jury found a 70 percent loss in Mrs. Dormaier's chance of survival, respondents may recover no more than that proportional percentage of damages as compensation. But considering our analysis in the section above, the special verdict had the same legal effect as if the jury based respondents' recovery on traditional tort principles instead of the lost chance doctrine. The special verdict entitled respondents to full recovery.

To determine if proportionate recovery is proper in a case where the lost chance of survival exceeds 50 percent, we should review the reasons our Supreme Court adopted the lost chance doctrine in *Herskovits*. We identify at least two rationales. First, according to Justice Dore's lead opinion, we do not want "a blanket release from liability for doctors and hospitals any time there was less than a 50 percent chance of survival, regardless of how flagrant the negligence." *Herskovits*, 99 Wn.2d at 614 (Dore, J., lead opinion). Second, the health care provider's own negligence has rendered it difficult to predict the chances of survival, since the trier of fact cannot review how the patient would have fared without negligent treatment. As Justice Dore

---

747, 768-71, 818 P.2d 1337 (1991).

noted, "The underlying reason is that it is not for the wrongdoer, who put the possibility of recovery beyond realization, to say afterward that the result was inevitable." *Id.* at 614. Restated: "'an actor is not completely insulated because of uncertainties as to the consequences of his negligent conduct.'" *Id.* at 616 (quoting *Hamil v. Bashline*, 481 Pa. 256, 271, 392 A.2d 1280 (1978)). Justice Pearson's plurality opinion echoes this second rationale where he writes:

> When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable.

*Id.* at 625-26 (Pearson, J., concurring) (quoting *Hicks v. United States*, 368 F.2d 626, 632 (4th Cir. 1966)). Neither rationale is furthered by reducing recovery where the defendant's negligence proximately caused the decedent's death.

The trial court did not err by denying appellants' request for a judgment award limited to 70 percent of both respondents' damages.

Affirmed.

Brown, J.

WE CONCUR:

Siddoway, A.C.J.

Fearing, J.

39