

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| HENRY TANG, Individually, | ) | DIVISION ONE |
| | ) | |
| Appellant/Cross-Respondent, | ) | No. 73751-1-I |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF SEATTLE, a Washington | ) | UNPUBLISHED OPINION |
| Municipality; SEATTLE PUBLIC | ) | |
| UTILITIES, a division of the City of | ) | |
| Seattle, | ) | |
| | ) | |
| Respondents/Cross-Appellants. | ) | FILED: July 11, 2016 |
| | ) | |

DWYER, J. — Henry Tang appeals from the summary dismissal of his lawsuit against the City of Seattle and Seattle Public Utilities (SPU).[1] After being demoted from senior civil engineer to associate civil engineer in 2013, Tang filed suit, claiming retaliatory demotion in violation of the Washington Industrial Safety and Health Act (WISHA), chapter 49.17 RCW. The superior court dismissed Tang's lawsuit in its entirety. On appeal, Tang first contends that he set forth sufficient evidence from which a jury could find that, prior to his demotion, the City knew that he had asserted a WISHA-protected safety complaint and punished him for doing so. Tang also contends that he states a claim for

---

[1] Tang is employed by SPU, a division of the City of Seattle. Unless otherwise noted, we refer to both entities collectively as "the City."

common law wrongful demotion in violation of public policy. However, Tang's evidence does not establish a prima facie case of statutory retaliatory demotion, and a separate claim for common law wrongful demotion in violation of public policy was neither pleaded nor argued in the superior court nor has it been recognized as a cause of action in this state. Accordingly, we affirm.

I

In 1994, Tang was hired as an assistant civil engineer by the City.

In 2000, Tang became a registered professional engineer, which required him to pass an examination and pay the required fee.

On May 5, 2008, Tang applied for reclassification as a senior civil engineer. The City's senior civil engineer job description sets forth distinguishing characteristics of the position, examples of assigned duties, and physical demands of the work environment:

<u>DESCRIPTION:</u>
**Class Summary:**

Supervises or performs senior-level professional civil engineering work in the planning, *design*, construction, operation and maintenance of municipal public works, utilities and services projects.

**Distinguishing Characteristics of the Class:**

Positions in this *advanced level class* require an extensive knowledge of the principles, practices and procedures of civil and construction engineering, including the methods, materials, equipment and techniques used in civil engineering, construction and inspection; *extensive knowledge and ability to perform civil engineering design*, drafting, mapping and computations, as well as to read and interpret plans, specifications, codes, property descriptions, construction schedules, contracts and other construction documents; and a thorough knowledge of the area of

practice. Some positions may require supervisory ability.

Positions in this class may supervise and/or serve as project engineers/managers on the most technically complex, visible and/or high priority projects or programs. These projects require a high level of technical proficiency as well as coordinative/administrative responsibility. Most positions require the ability to coordinate the efforts of a multi-discipline, multi-agency project team to complete a defined assignment or CIP.[2]

Guidelines available include engineering, drafting, design and construction standards, plans and specifications, architectural and engineering manuals, and relevant codes, ordinances, laws and regulations. Judgement [sic] is exercised in developing designs and design criteria, interpreting data from engineering documents, determining appropriate engineering methodology to apply, and originating, developing, and checking engineering projects through the various phases of planning, design, detail plans, specifications, estimates, contracts, construction, operation, and maintenance.

Positions in this senior level class work under limited supervision, independently resolving most routine problems but informing the supervisor of unusual or controversial problems. The supervisor reviews project status and provides general guidelines and direction with respect to deadlines, departmental priorities and in situations involving unprecedented circumstances. This class may lead or supervise professionals and technicians or serve as a technical expert in a civil engineering specialty area.

Contracts include inter and intra departmental, administrative, engineering and construction personnel, elected officials and their staff, other    government agencies, contractors, consultants and the public to exchange information, coordinate work, answer questions and respond to complaints.

<u>EXAMPLES OF DUTIES</u>:

- *Supervises or serves as project engineer/manager on the most technically complex, visible and/or controversial projects or programs involving several design specialties* including: planning studies of major pump stations, large pipelines projects, transmission line designs, hydroelectric generation facilities, substation structures, civil features of general plant

---

[2] "Capital Improvement Project."

facilities, combined sewer overflow facilities, bridges and roadway improvements.

- *Supervises and/or performs preliminary and final designs and/or prepares design criteria* for roadways, bridges, structures, signal and lighting systems, retaining walls, electrical substations, switchyard and transmission structures, generation plant facilities, sewers, storm drains, water mains, transmission pipelines, pump stations, treatment facilities and other related public works projects.
- Supervises and/or prepares cost estimates and engineering and feasibility reports and studies for public works projects and utility improvements.
- Supervises and/or prepares contract documents, technical specifications and plans.
- Supervises and/or prepares and monitors project schedules.
- Supervises and/or prepares progress and final reports and estimates.
- Serves as divisional reviewer of final plans, specifications, estimates, and agreements. Coordinates and oversees work of contractors, affected public agencies and utility crews.
- Reviews and writes contract change orders; and negotiates and recommends financial arrangements for additional work done.
- Supervises activities of a design team in the preparation of preliminary and long range plans, schedules, estimates, budgets, detail final construction plans, specifications, and agreements. Oversees project progress from design through construction.
- Prepares and administers consultant and BPW construction contracts, monitors contract progress and reviews invoices for approval.
- Monitors the work of consultants and construction contractors to ensure compliance with contract provisions and scope of work.
- Supervises field inspections of the more complex work done by contractors to ensure compliance with plans and specifications.
- Supervises structural inspections and preparation of condition appraisal reports.
- Supervises material testing and analysis during design and construction phases.
- Supervises the development of plans, specification and instructions for the installation, operation, and maintenance of traffic signals, signing, lighting, pavement marking and design

standards.
- Supervises the preparation of annual and long-range street and transportation improvement programs including need studies, cost estimation, environmental assessments, accident statistics analysis, traffic planning studies and grant applications.
- Supervises traffic engineering studies on traffic flow, traffic accident locations, parking, and other traffic-related matters.
- Supervises the review of shop drawings, material sources and specifications during construction.
- Serves as a technical expert in an engineering specialty area.
- Supervises environmental reviews of land development and improvement projects.
- Supervises hydraulic and/or hydrologic calculations and water supply and distribution system network analyses, including computer modeling.
- Supervises or prepares drawings of plans and details manually or with computer-aided drafting and design applications.
- Supervises the preparation of Local Improvement District cost distributions to assessment rolls and boundary maps.
- Coordinates contracts, designs, and new construction with other private and government agencies.
- Prepares a variety of reports, correspondence and official documents.
- Prepares budgets, workload forecasts, project variance reports, and progress reports.
- Participates in the selection, hiring and performance appraisal of subordinates.
- Meets with the public and representatives of other agencies and City departments to discuss current or proposed projects.
- Advises the legal staff of the City on complex engineering phases of court cases or legal problems relating to condemnation cases, appraisals of damages, and contract claims.
- Makes presentations and acts as team leader on special projects as assigned.
- Performs other related duties of a comparable level/type as assigned.

. . . .

WORK ENVIRONMENT/PHYSICAL DEMANDS:

- Most work is performed in a normal City work/office environment.

- *Field assignments entail exposure to all types of weather, traffic, hazardous/toxic substances and work in or near construction sites.*
- May be required to lift over 50 pounds.
- May be required to stand, walk, or bend for extended periods of time.
- May be required to work nights, evenings, weekends, and/or holidays.
- Overnight travel may be required.

. . . .

COMMENTS:
Class history: Class adopted January 2, 1991.

*This description was prepared to indicate the kinds of activities and levels of work difficulty required of positions in this class. It is not intended as a complete list of specific duties and responsibilities.*

(Emphasis added.)

In a March 4, 2009 classification determination report, the City simultaneously recommended and approved Tang's reclassification. The City also provided that the reclassification was retroactive to November 11, 2008.

In early 2011, Tang joined the solid waste and alternative contracting group. Tang's immediate supervisor was Daniel Enrico. At this time, the group's manager was Fred Aigbe. Enrico attested that, under his supervision, "[o]ne of Tang's assignments in 2011 was to support the initial 'options analysis'[3] phase for the Halladay Decant Facility Project"[4] (Halladay Project). The Halladay

---

[3] Enrico explained that "[t]he options analysis is the first phase of a project, in which various options are reviewed and one is selected based on financial, community, and environmental impacts."

[4] Enrico described the Halladay Project as follows:
The Halladay Decant Facility receives sediment from storm drains and dries the material to reduce its weight before taking it to a landfill. It covers an area about 70 feet long and 70 feet wide. The Halladay Project is considered a small project, with a construction budget of about $350,000, and primarily involved installing a canopy over the pit into which the sediment is deposited so that

Project was located approximately 500 feet from the Interbay landfill, which is now closed.[5]

Judith Cross, the director of facilities and real property service at SPU, was a "[s]pecifier" on the Halladay Project. Tang attested that "[t]he Specifiers are essentially the 'client' on the job. They are the ones that Mr. Enrico and I answer to on the Halladay Project."

In a January 17, 2013 memorandum, which was addressed to both Enrico and Aigbe, Cross expressed "my concerns related to Henry Tang['s], Sr. Civil Engineer, Project Management and Engineering Division failure to meet standard performance expectations of a Project Manager for the Halladay Vactor Decant Facility Improvements Project." Cross continued, stating, "I have observed and directly experienced Henry Tang's poor performance . . . from November 2011 to December 2012." She then opined that Tang had exhibited "poor performance issues" in areas relating to job specific skills, professional judgment, accomplishing tasks, quality of work, teamwork, and personal accountability. Ultimately, she demanded that "[a]s a result of Henry's performance . . . , I do not want Henry assigned as a Project Manager to any future Facilities capital improvement projects."

Consistent with the views expressed in Cross's memorandum, Enrico testified that "[b]ased on Tang's past performance, Cross did not want Tang

---

rainwater would not fill the pit and cause overflow, plus grading, paving, removal of contaminated soils, and installing a drainage system and fence.

[5] Min-Soon Yim, a utility manager at SPU, testified that the Interbay landfill "is now covered by a golf course."

- 7 -

assigned as the Project Manager when the Halladay Project entered its next phase in late 2011. She was critical of Tang in a group meeting in which I, Tang, and others were in attendance." In this meeting, Enrico defended Tang. Enrico eventually convinced Cross to accept Tang's assignment to the next phase. However, Enrico testified, "Cross's strong resistance to working with Tang caused me to start paying closer attention to Tang's performance and attendance."

In April 2011, Tang wrote a memo to the file regarding a "review of the in-house labor estimate" for the Halladay Project.[6] Therein, Tang provided general feedback on the current state of the project, the scope of the construction work, and the soft costs involved in completing the project. In a section discussing how to optimize soft costs, Tang stated, "[t]he Project Engineer will be responsible for the inter-discipline design integration. An individual with strong experience would probably keep the costs down." Tang did not assert any WISHA-protected safety complaint in this memo.

In February 2012, Tang was assigned as the project manager on the Halladay project.[7]

---

[6] This memorandum was addressed as being "[f]rom" both Tang and his colleague, Tom Fawthrop.

[7] "Self-serving affidavits contradicting prior depositions cannot be used to create an issue of material fact." McCormick v. Lake Wash. Sch. Dist., 99 Wn. App. 107, 111, 992 P.2d 511 (1999); see also, Klontz v. Puget Sound Power & Light Co., 90 Wn. App. 186, 192, 951 P.2d 280 (1998) ("'When a party has given clear answers to unambiguous [deposition] questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'" (alteration in original) (quoting Marshall v. AC&S, Inc., 56 Wn. App. 181, 185, 782 P.2d 1107 (1989))).

On March 6, Enrico issued Tang two memoranda.

In the first, entitled "Coaching Memo – Performance Standards," Enrico informed Tang that "[t]he purpose of this memo is to inform you that you continue to not meet performance standards in several areas and to provide you with my observations regarding your work performance." Enrico explained that, "[c]andidly, my impression is that your work production is lacking, and does not meet section expectations for a full time Sr. Civil Engineer," and that "[m]y observation of your meeting performance is that you are often late and unprepared." In summation, Enrico stated,

> [w]e have had at least three conversations regarding your performance in the last year including an hour on February 29, 2012. I believe I have been consistent in my message to you that your performance is not up to par of a Senior Civil Engineer and I am willing to provide support to you in order to correct the situation. I would have to say that your job execution is deficient, and needs substantial improvements in the areas of attendance, technical skills, quality assurance, client service and meeting deadlines.
> . . . .
> My expectation is that you will take whatever steps you deem necessary to ensure you are meeting expectations. Further, I expect that you will adhere to your schedule and report your work time accurately, ensuring that you are claiming pay only for hours you actually worked, or are covered by some appropriate leave. Continued failure to meet performance standards in these areas

---

On appeal, Tang attempts to create a question of fact with regard to when he became the project manager on the Halladay Project.

In a January 2015 deposition, Tang was questioned about his role on the Halladay Project. In response to a question asking about when he was assigned to the project, he testified, "[t]he project was not assigned to me until February of 2012." Later, in response to a question asking what his assigned role was, Tang testified that he was "a project manager."

In a June 2015 declaration, Tang testified, "I became the project manager in early 2011 on the Halladay Project."

We credit Tang's sworn deposition testimony indicating that he became the project manager in February 2012 and do not credit his later declaration testimony to the contrary.

may result in corrective action, up to and including termination of your employment.[8]

In the second, entitled "Expectations for Senior CE/Project Manager," Enrico stated both that "[t]he intent of this memo is to provide you with an 'expectations' document designed to point out and reinforce my expectations of your performance as a Senior CE," and that "this should provide the two of us with a roadmap to make improvements over the next year." Enrico then set forth his specific expectations of Tang in certain areas including work hours and attendance, overall performance, conduct leading up to and during meetings, communication, and training. In summation, Enrico stated,

> Henry I want to be positive and provide all the support you need to be successful. This memo is to provide a baseline for my expectations as your supervisor and provide a timeline by which we can resolve some of these lingering issues. If there are any extenuating circumstances please let me know.[9]

On March 26, Enrico conducted a performance review of Tang. Tang received "below standard" ratings in all areas except "safety," in which he received a "meets standard" rating. Enrico expressed his opinion regarding Tang's performance.

> Henry is a likeable guy with many good qualities including intelligence. I find him to[o] resistant to coaching that borders on outright refusal, and that has been problematic over the last year. I've mentored him many times to maintain communications via e-mails, agendas and meeting minutes and by and large he ignored my advice which resulted in negative feedback from one of his main clients.

---

[8] "Refuse to sign" is written on the "[e]mployee's signature" line of the coaching memorandum.

[9] Again, "[r]efuse to sign" is written on the "[e]mployee's signature" line of the expectations memorandum.

Candidly, my impression is that Henry's work production is lacking, and does not meet section expectations for a full time Sr. Civil Engineer.

My observation of his meeting performance is that he is often late and unprepared. I don't consistently see agendas from him in my "inbox" and meeting minutes are rarely distributed as I have requested repeatedly.

Client/Specifier service is at a low-point. The Facilities Group has consistently provided me with "unsatisfactory feedback" in terms of his timeliness and quality assurance.

Since the beginning of March 2012, Henry has been making good progress in achieving higher performance. I hope that he uses this evaluation of his 2011 performance in a positive manner and he continues to progress throughout 2012 and beyond.

My plan is to have another Performance Review in 6-months to assess Henry's progress.

Shortly thereafter, Enrico's performance review of Tang was examined by a manager. The manager agreed with the assessment and feedback that Enrico had provided to Tang.

We all like Henry and want him to succeed. I generally concur with Dan [Enrico's] assessments of Henry's performance; I think the feedback are constructive. I applaud Henry for acknowledging that there are opportunities for improvements in some aspects of his work. I want to assure Henry that the SPU Management is prepared/readied to provide him with the resources/tools he needs to succeed! The intent of our coaching is to position Henry for success!

On April 2, Enrico issued Tang a memorandum documenting that Tang had received a verbal warning for insubordination. Therein, Enrico stated that "[t]his memo documents the Verbal warning you received for your repeated refusal to follow my instructions to you as your supervisor." Enrico then both

specified the occasions on which Tang had not followed his instructions and reiterated his expectations of Tang. He continued, stating, "[y]our behavior and refusal to follow my instructions violates these basic workplace expectations and amounts to insubordination. This is not acceptable and needs to stop immediately." Further, he stated, "[a]s we have discussed several times, it is important for you to begin to demonstrate that you are able to perform your job at the established standards, be at work as scheduled, and use your work time productively." In closing, Enrico stated,

> I hope that this warning will help you recognize the severity of your actions, and encourage you to make the changes necessary to correct your behavior. This verbal warning will be placed in your personnel file. Additional incidents of insubordination, or continued failure to meet performance standards and workplace expectations may result in further disciplinary action, up to and including termination of your employment.[10]

On April 11, Min-Soon Yim, a utility manager at SPU, tested the soil surrounding the Halladay Project site for the presence of flammable gas.[11] The test results indicated that the soil contained methane gas. Yim communicated these test results in an e-mail that was addressed to Tang and his colleagues Cody Nelson and Jeff Neuner.

On May 23, the Halladay Project team held a meeting regarding "Methane and Hazmat Screening." The notes from this meeting indicate that the team

---

[10] Again, "[r]efused to sign" is written on the "[e]mployee" signature line of this memorandum.
[11] It was Tang's colleague, Cody Nelson, who arranged for the flammable gas testing to be performed at the Halladay Project site, not Tang. Nelson worked in conjunction with Gail Coburn to determine the type of testing to be performed.

discussed that "[a] Methane Mitigation Plan stamped by [a] PE [Professional Engineer] would be required (for permitting)."

On August 31, Enrico issued Tang a written reprimand for insubordination and frequent tardiness. Therein, Enrico informed Tang that "[y]ou are receiving this written reprimand because of continued issues with you pertaining to attendance and performance." Enrico then set forth specific examples of Tang's "persistent insubordination with regard to these concerns." Enrico also informed Tang that "[g]oing forward I would like to propose that we approach the completion of your workload in a more controlled fashion." This required that Tang report his progress to Enrico during weekly one-on-one meetings. In so requiring, Enrico informed Tang that he was "dedicated to provide every kind of support as your supervisor so we can shore up your communications and work production." In closing, Enrico stated,

> This written reprimand will be placed in your personnel file. Continued failure to meet performance standards and workplace expectations may result in further disciplinary action, up to and including termination of your employment.[12]

That same day—during a meeting attended by Tang, Enrico, and Aigbe— Enrico assigned Tang the civil site design work on the Halladay Project.[13] Tang refused to perform the assigned task.

---

[12] Again, "[r]efused to sign" is written on the "[e]mployee" signature line of the written reprimand.

[13] Enrico described the type of design work required on the Halladay Project. Civil site design covers basic tasks to get a site's surface ready for construction. It does not include things like electrical, structural, or mechanical engineering. For Halladay, the civil site design included grading, paving, soil removal, a water meter relocation, and installing a drainage system and a fence. That is basic stuff that a Senior Civil Engineer at SPU should be readily able to complete.

On September 6, Enrico again met with Tang. During this meeting, Tang, once again, refused to perform the civil site design work.

Later that same day, Tang sent Enrico an e-mail purporting to document their conversation during the meeting. Subsequent e-mail between Enrico and Tang regarding this meeting spanned many days. Therein, Tang reiterated his position that he did not "have the background design experience and competency to perform the engineering design for this project; and it would be inappropriate to do so." Tang cited the Washington Administrative Code[14] as authority for his assertion. In response, Enrico reiterated that he "believe[d] [Tang] d[id] have the background to perform the civil site work," and that he "offered to work side by side with [Tang] and complete the design together as a team."

On September 21, Enrico wrote a memorandum to Linda De Boldt, the deputy director of the project delivery branch. Therein, Enrico recommended that Tang be suspended for three days without pay "for insubordination and poor performance." Enrico elaborated, stating that, "[p]rimarily, this suspension is related to Henry's repeated refusals to accept a task as a Senior Civil Engineer." Specifically, Enrico stated that "Henry has repeatedly refused to perform design work on an engineering assignment for the Halladay Decant Project."

---

Getting that work done did not depend on having a methane mitigation plan in place.

[14] Tang referenced WAC 196-27A-020, which sets forth "[f]undamental canons and guidelines for professional conduct and practice." The relevant provision, WAC 196-27A-020(2)(d), provides that registered professional engineers "shall be competent in the technology and knowledgeable of the codes and regulations applicable to the services they perform."

That same day, in a memorandum addressed to SPU director Ray Hoffman, Boldt agreed with Enrico's recommendation.

In late October, Tang accepted the civil site design work on the Halladay Project.

Thereafter, Tang went on vacation. Enrico attested that, upon Tang's return, "he did little work on Halladay—or any other project—despite my repeated inquiries."

In a February 5, 2013 letter, Boldt informed Tang that several employees, including Enrico, were recommending that he be demoted from senior civil engineer to associate civil engineer. She explained that "[t]his recommendation is based on your continued failure to perform the responsibilities required of a Senior Civil Engineer."

On February 26, Tang and his union representative attended a Loudermill[15] hearing regarding the recommended suspension and demotion.

On April 2, SPU director Hoffman sent Tang a letter informing him that "I have decided to uphold your management's recommendation for demotion." Tang's demotion was effective on April 10, 2013. Hoffman found that Tang "repeatedly refused to do the work that was needed" and that whether that "refusal was due to a lack of ability, or simple unwillingness to do your job, there has been no appreciable work product from you over the last 2 years to establish you have been performing as a Senior Civil Engineer." Hoffman specifically

---

[15] Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).

found that none of the work Tang had been assigned to do had been "unethical nor unsafe." This latter finding was made in response to Tang's claim—raised for the first time at the hearing—that his refusal to do the assigned work was related to safety and the presence of methane.

In May, Tang filed a WISHA complaint with the Department of Labor and Industries (the Department). Therein, Tang described the City's alleged act of retaliation as follows:

> I am being retaliated against for refusing to perform engineering design that could have put the public and workers at risk of an uncontrolled gas explosion. . . .I informed that only a licensed engineer with qualifying technical expertise and competency should perform the design because of potential risks of explosion and safety to the public. The employer, instead, reprimanded me for insubordination for refusing to comply with management's directives to perform the assigned engineering design work. Other adverse actions include change of responsibilities, office relocation, and demotion.

In response to Tang's complaint, the Department conducted an investigation. Following this investigation, Susan Rue, the Department's investigations program manager, concluded, "there is insufficient evidence to substantiate that discrimination, as defined by the WISH Act, occurred." Tang appealed Rue's decision to the Department director, Joel Sacks, who affirmed Rue's conclusion.

In June, Yim and Enrico met and established a methane mitigation plan for the Halladay Project site.[16]

In October 2013, Tang filed suit. In his complaint, Tang pleaded the

_____

[16] When deposed, Yim testified that another person was also present at this meeting. In response to a question asking if this person was an engineer, Yim testified, "I think so."

following causes of action:

## 4.0    CAUSES OF ACTION

*As several causes of action against Defendant/Respondent, severally or alternatively, Plaintiff/Petitioner alleges as follows:*

*(Discrimination under RCW 49.17; Retaliation; Failure to follow the law)*

4.1    Mr. Tang re-alleges and incorporates by reference paragraphs 1.1 through 3.8.[17]

4.2    Mr. Tang was correct or reasonably believed he was correct in requiring certain elements be necessary for the completion of the Halladay Decant Project.  Mr. Tang's professional engineering license was at stake and his professional determinations were in line with the legal requirements and professional requirements for the project.  Mr. Tang was following the law as he read and understood the purpose of the statute requiring a Methane Mitigation Plan under certain circumstances for the proposed construction within an approximate region from a landfill.

4.3    Mr. Enrico's actions toward Mr. Tang were as a direct result of Mr. Tang's decisions on the project and his reporting his decisions to others, and Mr. Tang raising these issues with the union and with the Department of Labor and Industries.

4.4    RCW 49.17.160 provides in pertinent part:

In any such action the superior court shall have jurisdiction, for cause shown, to restrain violations of subsection (1) of this section and order all appropriate relief including rehiring or reinstatement of the employee to his or her former position with back pay.

4.5    Mr. Tang seeks all relief available to him under RCW 49.17.160 and any other law applicable for damages related to his decisions and the retaliation that followed on the Halladay Project.

4.6    Mr. Tang seeks reinstatement of his job position as Civil Engineer, Senior.  Mr. Tang seeks back pay for the demotion such that his pay and benefits would be as if he was a Civil Engineer, Senior at all times.  Mr. Tang seeks reinstatement of his employment records

---

[17] Paragraphs 1.1 through 3.8 set forth the parties to the action, jurisdiction and venue, and the general factual background.

to be as they were prior to this action. Mr. Tang seeks a mandatory injunction requiring the City of Seattle to stop all discriminatory and retaliatory actions against him.

The City later moved for summary judgment on the merits of Tang's statutory retaliation claim. The superior court granted the motion, dismissing Tang's lawsuit.

Tang now appeals.

II

Tang first asserts that the superior court erred by granting summary judgment in favor of the City on his statutory retaliation claim pursuant to RCW 49.17.160. This is so, he asserts, because an issue of fact exists as to whether his supervisor, Daniel Enrico, had actual knowledge of his safety complaints regarding the presence of methane gas in the soil surrounding the Halladay Project site, which is a fact material to establishing his retaliatory demotion claim. We disagree.

We review a trial court's grant of summary judgment de novo. Camicia v. Howard S. Wright Constr. Co., 179 Wn.2d 684, 693, 317 P.3d 987 (2014). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Camicia, 179 Wn.2d at 693. When making this determination, we consider all the facts and make all reasonable, factual inferences in the light most favorable to the nonmoving party. Young v. Key Pharms., Inc., 112 Wn.2d 216, 226, 770 P.2d 182 (1989).

WISHA provides, in pertinent part, that "[n]o person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." RCW 49.17.160(1).

A similar provision is found in Washington's Industrial Insurance laws. See RCW 51.48.025(1). In an action brought under that statute, when a plaintiff who claims retaliation for filing or expressing an intent to file a workers' compensation claim lacks direct evidence of retaliation, the burden-shifting analysis articulated in Wilmot v. Kaiser Aluminum and Chemical Corp., 118 Wn.2d 46, 821 P.2d 18 (1991), is used to determine the proper order and nature of proof on summary judgment. The same burden-shifting scheme is appropriately utilized to analyze Tang's appellate claims for relief.[18]

Thus, Tang must first articulate a prima facie case of retaliation. To do so, Tang must show (1) that he either exercised or expressed an intent to exercise a statutory right that is protected by WISHA, (2) that the City engaged in an adverse employment action against him, and (3) that there was a causal link

---

[18] In his brief, Tang cites to Ellis v. City of Seattle, 142 Wn.2d 450, 13 P.3d 1065 (2000), as setting forth the proper method by which to analyze his statutory retaliation claim. His reliance on Ellis is mistaken.

First, the only issue that our Supreme Court reviewed in Ellis was the summary dismissal of Ellis's common law wrongful discharge in violation of public policy claim. It did not review the dismissal of Ellis's statutory retaliation claim brought pursuant to RCW 49.17.160. See Ellis, 142 Wn.2d at 458.

Second, the court analyzed Ellis's claim utilizing the Perritt analysis. The Perritt analysis is applicable when a plaintiff's claim does not fit neatly within the tort of wrongful termination in violation of public policy. Becker v. Cmty. Health Sys., Inc., 184 Wn.2d 252, 259, 359 P.3d 746 (2015) (citing Gardner v. Loomis Armored, Inc., 128 Wn.2d 931, 941, 913 P.2d 377 (1996)) (citing HENRY H. PERRITT, JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES § 3.7 (1991)). Because Tang's claim is a statutory claim pursuant to RCW 49.17.160 (and not based on the common law tort of wrongful termination in violation of public policy), the Perritt analysis is inapplicable.

between his exercise of the statutory right protected by WISHA and the adverse employment action, in this case that the City's motivation for demoting Tang was his exercise of or intent to exercise the statutory right.[19] See Wilmot, 118 Wn.2d at 68-69.

To demonstrate the third element—the requisite causal link—Tang must present sufficient evidence tending to show that the protected activity was *a* cause of the adverse employment action. See Wilmot, 118 Wn.2d at 69-70. In other words, that Tang's exercise or intent to exercise a statutory right protected by WISHA was "a significant or substantial factor" in bringing about the adverse employment action. See Wilmot, 118 Wn.2d at 71.

Further, "[e]ssential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity." Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982). "'At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action.'" Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999) (quoting Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993)); see also Kahn v. Salerno, 90 Wn. App. 110, 131, 951 P.2d 321 (1998) (requiring that the employee establish that "the employer knew of the opposition activity" in a retaliation case).

The parties agree that, given the City's demotion of Tang from senior civil engineer to associate civil engineer, he met his burden as to the second element

---

[19] Proof of the prima facie case may be by circumstantial evidence. See Wilmot, 118 Wn.2d at 69.

(adverse employment action). The City argues that Tang did not meet his burden as to the other two elements both because he did not engage in a statutorily-protected activity prior to his demotion and because there is no causal link between any statutorily-protected activity and Tang's demotion. We agree.

In both his appellate briefing and at oral argument before this court, Tang's counsel alleged that Tang, on numerous occasions prior to his demotion, engaged in a WISHA-protected activity by complaining to Enrico about safety concerns regarding the presence of methane gas in the soil surrounding the Halladay Project site.[20] However, to the extent that Tang asserts that he engaged in an activity that was protected by WISHA on each of these occasions, he nonetheless fails to set out the requisite causal link showing that Enrico actually knew of any such complaint prior to Tang's demotion.[21]

---

[20] When deposed, Tang was questioned about whether he had asserted safety concerns as a reason for not performing the assigned design work. In response to a question asking whether, in June and July of 2012, Tang recalled raising safety concerns as a reason for not performing the work, Tang testified,

> Yeah, I don't – I cannot remember going in depth about the requirement for a methane mitigation plan or any of the details. I have mentioned the methane mitigation plan as – okay. This design – okay. This design is outside – this design is outside of my competency area, methane mitigation plan I know nothing about. And then, you know, because – because a lot of these conversations has been recurring, has been discussed at length, there was really no need to go into a lecture about a methane mitigation plan every single time. Kind of say, okay, it's a multidisciplinary design, it's inappropriate for me to do it, and – and that's it. Sometimes – sometimes methane mitigation plan isn't mentioned because that's always on the radar.
>
> So in response to your question, at – at times I have mentioned methane mitigation plans in these discussions, I'm just not sure during those times where I mentioned the WAC or made reference to the professional engineer code of conduct, that I have talked about the methane mitigation plan specifically in those particular meetings.

[21] Tang places great significance on Enrico's alleged knowledge of his WISHA-protected safety complaint. However, Enrico was not the ultimate decision-maker with regard to whether Tang was to be demoted. This decision rested with Hoffman. Thus, even had Tang shown that Enrico had actual knowledge of a WISHA-protected safety complaint, it is pure speculation to

Tang asserts that he "first told Enrico about his concerns in writing in comments on an April 2011 memorandum to the Halladay project file [that] Enrico could access at any time." Br. of Appellant/Cross-Resp't at 8. At oral argument, his counsel maintained that Tang first engaged in a WISHA-protected activity "when he wrote the memo to the file saying we need to have a consultant—a third party—do the design for the Methane Mitigation Plan." Wash. Court of Appeals oral argument, Tang v. City of Seattle, No. 73751-1-I (June 7, 2016), at 2 min., 55 sec. (on file with court). To the extent that such an activity— a memo to a file—could constitute a WISHA-protected activity, Tang fails to make the requisite showing of a causal link between filing the memorandum and his demotion. Indeed, the memorandum does not mention any safety concern at all, let alone one that was asserted by Tang. Additionally, there is no indication that Enrico read the memorandum.[22]

Tang also asserts that his "concern for safety was noted by Enrico in his March 2012 employee review." Br. of Appellant/Cross-Resp't at 38. Specifically, Tang avers that, "it is clear that Enrico was well-aware of Tang's concern about

---

infer that a person having knowledge of an employee's protected activity actually told the decision-maker about the protected activity. See Clover, 176 F.3d at 1355 (concluding that "'could have told' is not the same as 'did tell'"). We nevertheless analyze Tang's claims, as briefed and presented.

[22] At oral argument, Tang's counsel was asked who was aware that Tang had written this memorandum. Wash. Court of Appeals, supra, at 3 min., 9 sec. His counsel responded, "[a]nyone and everyone on that project." Wash. Court of Appeals, supra, at 3 min., 13 sec. When questioned further, Tang's counsel stated that "his supervisor, in particular" was aware that Tang had written the memo to the file. Wash. Court of Appeals, supra, at 3 min., 17 sec. When asked when Tang's supervisor became aware of this memorandum, his counsel stated, "[i]n April of 2011, if the supervisor was doing his job he would have (inaudible) in the file." Wash. Court of Appeals, supra, at 3 min., 26 sec. To the contrary, the mere existence of a memorandum directed to a file does not, of itself, constitute a WISHA-protected safety alert nor does it establish that any particular person—or any person at all—actually read the memo.

safety, because within a performance review fraught with 'Below Standard' ratings, Tang received a 'Meets Standards' rating in the area of 'Safety,' indicating that he was contributing to and promoting a safe work environment." Br. of Appellant/Cross-Resp't at 14-15. To the contrary, a "meets standards" performance rating in the area of "safety" does not establish either the existence of a WISHA-protected safety alert—known to someone other than Tang—or a causal link between such an activity and Tang's demotion.

At oral argument, Tang's counsel asserted that "one time when we can flat out prove that Mr. Enrico knew that Mr. Tang was refusing to do the project was when he got the methane levels tested in April of 2012." Wash. Court of Appeals, supra, at 4 min., 2 sec. To the contrary, an e-mail sent by Cody Nelson established that it was Nelson who arranged for the methane gas testing at the Halladay Project site. To the extent that such an activity—the act of arranging for methane gas testing—could constitute a WISHA-protected activity, an act performed by Nelson—who is someone other than Tang—does not establish either that Tang engaged in a WISHA-protected activity or a causal link between that activity and Tang's demotion.

In his briefing, Tang also asserts that he engaged in a WISHA-protected activity during a May 23, 2012 meeting. Specifically, he asserts that his safety concern was reflected in "[m]eeting minutes from a May 23, 2012 meeting regarding 'Methane and Hazmat Screening' for the Halladay Project [which] noted that 'a Methane Mitigation Plan stamped by [a] PE would be required (for

permitting).'"[23] Br. of Appellant/Cross-Resp't at 38. Again, even if this somehow constituted a WISHA-protected activity, Tang does not make the requisite showing of a causal link between these meeting minutes and his demotion. First, the meeting minutes (stating the need for a methane mitigation plan) do not, by themselves, reflect that Tang asserted any WISHA-protected safety complaint. Second, the minutes indicate that Enrico was not in attendance, again failing to connect him to any WISHA-protected safety complaint allegedly asserted by Tang at this time.

In his briefing, Tang additionally contends that the content of a June 2012 risk register and consultant contract risk management checklist proves that he engaged in a WISHA-protected activity. Specifically, he avers that this checklist "noted environmental and bodily injury hazards." Br. of Appellant/Cross-Resp't at 38. Again, Tang's claim fails. First, that the document notes "environmental and bodily injury hazards" does not prove that Tang asserted a WISHA-protected safety complaint regarding the presence of methane gas at the Halladay Project site. Second, Tang does not show that Enrico was aware of the checklist or— more importantly—that anything therein would have notified him that Tang had made a WISHA-protected safety complaint.

In his briefing, Tang also asserts that his WISHA-protected activity is reflected in a June 28, 2012 memorandum. Specifically, he avers that this

---

[23] When deposed, in response to a question asking whether it was Tang's conclusion that a methane mitigation plan was necessary, or whether it was his colleagues, Gail Coburn and Jeff Neuner, who came to this conclusion, Tang testified, "[i]t was their conclusion that it was necessary based on the scope of the project." Again, proof of actions taken by others does not prove the existence of an action taken by Tang.

memorandum, which was addressed to Tang from SPU's geotechnical engineering department, stated,

> A methane monitoring and mitigation plan should be developed and implemented. Since hydrogen sulfide can occur in areas that have high methane readings, consideration should be given to the potential for hydrogen sulfide and associated worker safety.

Br. of Appellant/Cross-Resp't at 39. Tang's receipt of this memorandum can in no way be characterized as a WISHA-protected activity. Moreover, the memorandum itself does not reference any WISHA-protected safety concern, let alone any concern allegedly asserted by Tang. Furthermore, considering that the memo was addressed to Tang, not Enrico, it does not establish that Enrico had knowledge of any supposed WISHA-protected claim asserted by Tang and memorialized in that memo.

In his briefing, Tang also asserts that he engaged in a WISHA-protected activity when he notified the Department of Ecology (DOE) about the hazardous substances at the Halladay Project site in July 2012. Specifically, he claims that "in his capacity as the Project Manager of the Halladay Project [ ], Tang notified the DOE of the hazardous substances at the site, and provided McDonald, the SPU Specifier with the notice." Br. of Appellant/Cross-Resp't at 39. Again, to the extent that Tang engaged in a WISHA-protected activity by reporting the presence of hazardous substances to DOE, he fails to make the requisite showing of a causal link between this act and his demotion. First, his act of notifying the DOE, by itself, does not establish either that he was asserting a WISHA-protected complaint or that Enrico had actual knowledge of such a

complaint. Indeed, nothing in that memo connects the possible existence of hazardous substances to Tang's refusal to do the work assigned him. Second, by Tang's own admission, he provided McDonald, not Enrico, with the notice. Thus, again, there is no indication that Enrico had actual knowledge of any protected activity on Tang's part.

Tang next asserts that he engaged in a WISHA-protected activity when he "sought and received approval for an engineering company to perform the design work related to construction of the project to mitigate harm from the methane gas exposure and other toxic waste or chemicals." Br. of Appellant/Cross-Resp't at 39-40. At oral argument, Tang's counsel maintained that Tang engaged in a WISHA-protected activity when "he obtained the authority from the client," Wash. Court of Appeals, supra, at 2 min., and when "he obtained, he put that in the project management plan and he obtained financial approval for that—in the summer—in July of 2012." Wash. Court of Appeals, supra, at 2 min., 7 sec. Again, even if this somehow constituted a WISHA-protected activity, Tang does not make the requisite showing of a causal link between this act and his demotion. First, the act of receiving authorization and financial approval for another entity to perform the design work, by itself, does not indicate that Tang asserted a WISHA-protected safety complaint. Second, because Tang allegedly received this authorization from the client (and not from Enrico), there is no indication that Enrico had actual knowledge either that such an arrangement had been made or that it allegedly arose from a WISHA-protected action of Tang's.

At oral argument, Tang's counsel argued that Tang made a WISHA-protected safety complaint in a series of e-mails in August and September of 2012. Tang's counsel elaborated, stating, "there's a series of e-mails in August—August 31st, September 12th . . . where he—Mr. Tang simply refuses to do this project with respect to—or the design, I'm sorry. And he lays out in his e-mails that—that refusal having to do with safety issues."[24] Wash. Court of Appeals, supra, at 17 mins, 30 sec. This assertion again fails. First, the place in the record to which Tang's counsel directs us as setting forth these e-mails is, in fact, not a series of e-mails dating from August 31st and September 12th but, rather, a document setting forth the scope of work on the Halladay Project.[25] This document does not reference any WISHA-protected safety concern, let alone one asserted by Tang. Second, there is no indication, from the content of this document that Enrico had actual knowledge either of this document or that Tang had allegedly asserted any WISHA-protected safety complaint at this time.

Finally, to the extent that Tang argues that the filing of his actual WISHA complaint with the Department qualifies as his statutorily protected activity, he

---

[24] At oral argument, when asked whether, when Tang says "safety issues," he says "methane," Tang's counsel stated, "He does. It's mentioned eight times within the scope, within those e-mails." Wash. Court of Appeals, supra, at 18 mins, 04 sec.

[25] In another portion of the record, there is a September 12, 2012 e-mail exchange between Tang and Cross. Therein, Cross asked Tang some questions regarding the status of the project and he responded to these inquiries. Nowhere in this exchange did Tang assert a WISHA-protected safety complaint.

fails to make the requisite showing of a causal link between this complaint and his demotion because he filed the complaint *after* he had been demoted.[26]

Tang never established that, prior to his demotion, anyone responsible for his demotion was aware of his making a WISHA-protected complaint. Indeed, he never established that he made such a complaint at all (prior to his demotion). Summary dismissal of his RCW 49.17.160 claim was proper.

In addition, "in establishing the prima facie case, '[p]roximity in time between the claim and the firing is a typical beginning point, coupled with evidence of satisfactory work performance and supervisory evaluations." Wilmot, 118 Wn.2d at 69 (alteration in original) (quoting 1 L. Larson, Unjust Dismissal, § 6.05[5], at 6-51 (1988)). Tang's evidence does not meet this test.

Indeed, most of Tang's asserted instances of protected actions took place months before either the demotion recommendation or the actual demotion. However these periods are measured, Tang's performance was uniformly not "satisfactory." No reasonable jury could conclude that Tang was performing adequately in his job. And any reasonable juror would simply have to take Tang

---

[26] In his brief, Tang references a conversation that allegedly occurred between him and Enrico during the "summer-fall of 2011" wherein he avers, once again, that he asserted a WISHA-protected safety complaint. Br. of Appellant/Cross-Resp't at 9.

Tang states that on this occasion he "informed Enrico that design would be a challenge for him on the Halladay Project, particularly because it was landfill related, which inherently has methane and other chemical and combustible issues." Br. of Appellant/Cross-Resp't at 9. To the extent that Tang asserts that he engaged in a WISHA-protected activity on this occasion, he fails to make the requisite showing of a causal link between this conversation and his demotion because the declaration to which he cites indicates that, during this conversation, Tang was referring to the design work being a challenge for *Enrico* to perform, not a challenge for *Tang* to perform.

at his word (that he lacked the competence to do his job) in order to determine that his demotion was warranted.

For these reasons, also, dismissal of Tang's RCW 49.17.160 claim is affirmed.

III

Tang next contends that the superior court erred by dismissing his lawsuit without ruling on what he purports to be a common law claim of wrongful demotion in violation of public policy. We disagree.

RAP 9.12 provides:

> On review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court. The order granting or denying the motion for summary judgment shall designate the documents and other evidence called to the attention of the trial court before the order on summary judgment was entered. Documents or other evidence called to the attention of the trial court but not designated in the order shall be made a part of the record by supplemental order of the trial court or by stipulation of counsel.

(Emphasis added.)

Given RAP 9.12's directive that, when reviewing a trial court's summary judgment order, "the appellate court will consider only evidence and issues called to the attention of the trial court," we must determine whether Tang both sufficiently pleaded and sufficiently argued a common law tort claim of wrongful demotion in violation of public policy in the superior court. The record establishes that he did neither.

A

Tang first asserts that, in his compliant, he sufficiently pleaded a common law tort claim of wrongful demotion in violation of public policy. The face of his complaint indicates otherwise.[27]

"[A] complaint should adequately alert the defendant of the claim's general nature." In re Estate of Dormaier v. Columbia Basin Anesthesia, PLLC, 177 Wn. App. 828, 853-54, 313 P.3d 431 (2013). In doing so, "a complaint must identify the legal theory on which the plaintiff seeks relief." Dormaier, 177 Wn. App. at 854. "While inexpert pleadings may survive a summary judgment motion, insufficient pleadings cannot." Pac. Nw. Shooting Park Ass'n v. City of Sequim, 158 Wn.2d 342, 352, 144 P.3d 276 (2006); Dormaier, 177 Wn. App. at 854. "A complaint is insufficient if it does not give the defendant 'fair notice of what the claim is and the ground upon which it rests.'" Dormaier, 177 Wn. App. at 854 (quoting Williams v. W. Sur. Co., 6 Wn. App. 300, 305-06, 492 P.2d 596 (1972)); accord Shooting Park Ass'n, 158 Wn.2d at 352.

Further,

> "[a] party who does not plead a cause of action or theory of recovery cannot finesse the issue by later inserting the theory into trial briefs and contending it was in the case all along." Dewey[v. Tacoma Sch. Dist. No. 10,] 95 Wn. App. [18,] 26, [974 P.2d 847 (1999)]. See Shanahan v. City of Chi., 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

Kirby v. City of Tacoma, 124 Wn. App. 454, 472, 98 P.3d 827 (2004).

---

[27] "We interpret and apply CR 8 pleading requirements de novo." In re Estate of Dormaier v. Columbia Basin Anesthesia, PLLC, 177 Wn. App. 828, 853, 313 P.3d 431 (2013).

Here, the face of Tang's complaint did not notify the City that he was asserting a common law tort claim of wrongful demotion in violation of public policy. In the heading of his complaint, he characterized his claim as *"(Discrimination under RCW 49.17; Retaliation; Failure to follow the law)."* In paragraph 4.5, he elaborated by stating that he "seeks all relief available to him under RCW 49.17.160 and any other law applicable for damages related to his decisions and the retaliation that followed on the Halladay Project." Both of these characterizations are too general to support the assertion of a common law claim of wrongful demotion in violation of public policy. Thus, we conclude that Tang did not sufficiently plead such a claim in the superior court.

B

The City also asserts that Tang did not argue a claim of common law wrongful demotion in violation of public policy in the superior court. We agree.

The record indicates that at all times—from the filing of Tang's complaint through the oral argument on the City's motion for summary judgment—Tang argued a single statutory claim of retaliation pursuant to RCW 49.17.160.[28] Thus, he is foreclosed on appeal from arguing a different cause of action. See Cano-Garcia v. King County, 168 Wn. App. 223, 248, 277 P.3d 34 (2012) ("Issues and contentions neither raised by the parties nor considered by the trial court when ruling on a motion for summary judgment may not be considered for the first time on appeal."); see also Silverhawk, LLC v. KeyBank Nat'l Ass'n, 165

---

[28] At oral argument, both the City and the superior court judge characterized Tang's claim as a single statutory claim pursuant to RCW 49.17.160. Tang did not object nor did he assert otherwise.

Wn. App. 258, 265, 268 P.3d 958 (2011) ("An argument neither pleaded nor argued to the trial court cannot be raised for the first time on appeal.").

C

Moreover, a common law cause of action for wrongful demotion in violation of public policy does not exist in Washington. "[T]he tort of wrongful discharge in violation of public policy clearly applies only in a situation where an employee has been discharged." Roberts v. Dudley, 140 Wn.2d 58, 76, 993 P.2d 901 (2000); accord White v. State, 131 Wn.2d 1, 18-20, 929 P.2d 396 (1997) (refusing to extend the common law cause of action to include disciplinary actions less than discharge). We have recognized this limitation. Woodbury v. City of Seattle, 172 Wn. App. 747, 753, 292 P.3d 134 (2013) ("[The employee] does not have a common law tort claim, because there is no common law tort for disciplinary action less severe than termination."). Thus, Tang does not establish a basis for appellate relief.

IV

Finally, Tang requests an award of attorney fees and costs pursuant to RCW 4.84.360.[29] This request fails for two reasons. First, he is not the prevailing party on appeal. Second, the statute to which he cites permits the

---

[29] RCW 4.84.360 provides:
Fees and other expenses awarded under RCW 4.84.340 and 4.84.350 shall be paid by the agency over which the party prevails from operating funds appropriated to the agency within sixty days. Agencies paying fees and other expenses pursuant to RCW 4.84.340 and 4.84.350 shall report all payments to the office of financial management within five days of paying the fees and other expenses. Fees and other expenses awarded by the court shall be subject to the provisions of chapter 39.76 RCW and shall be deemed payable on the date the court announces the award.

court to award fees to a party who prevails in judicial review of claims under the Administrative Procedure Act. See RCW 4.84.340(4).[30] Tang did not bring such an action. For each reason, we deny his request.[31]

Affirmed.

We concur:

---

[30] RCW 4.84.340(4) provides that, "'[j]udicial review' means a judicial review as defined by chapter 34.05 RCW." Chapter 34.05 RCW sets forth the provisions of the Administrative Procedure Act.

[31] Given our resolution of this matter, we do not address the City's cross appeal.