IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| AMANDA PITTS (nee/aka AMANDA COMPTON, nee/aka AMANDA CRUTCHFIELD) and PAUL PITTS, individually; and AMANDA PITTS as Personal Representative of the ESTATE OF TAYLOR PITTS, and on behalf of all statutory claimants and beneficiaries, | ) ) ) ) ) ) ) ) | No. 32512-1-III |
| Appellants, | ) ) | UNPUBLISHED OPINION |
| v. | ) ) ) | |
| INLAND IMAGING, L.L.C., a Washington business entity and healthcare provider; INLAND IMAGING ASSOCIATES, P.S., a Washington business entity, | ) ) ) ) ) ) ) | |
| Respondents. | ) ) | |

KORSMO, J. — Amanda and Paul Pitts (collectively Pitts) appeal from an adverse

jury verdict and the trial court's decision to grant partial summary judgment on one of

their claims. As they have identified neither error nor abuse of discretion, we affirm.

FACTS

This case arose from the death in utero of one of the twin daughters being carried

by Amanda Pitts in 2007-2008. Nearly a decade later, this tragic loss is the basis for the

current litigation. This appeal revolves around the actions of defendant Inland Imaging in its reading of sonograms taken during the pregnancy.

Inland sonographers performed ultrasound examinations on Ms. Pitts in 2007 on August 10, August 27, October 4, November 5, and December 7. An Inland radiologist then would read the sonograms and report to the obstetrician. Upon discovering that the twins were both girls, the Pitts named them Samantha and Taylor.

The radiologists reported that the findings of the first two ultrasound "are consistent with a dichorionic diamniotic pregnancy." Clerk's Papers (CP) at 197-198. On the August 27 ultrasound, the radiologist noted they read a "twin peak sign" (also called the lambda sign, based on its visual resemblance to the Greek $\lambda$). CP at 225. This sign, only seen early in pregnancy, is an indication that the two fetuses are each in their own amniotic sac, with their own chorionic membrane (meaning each fetus accesses their own placenta).[1] Shown on the left of the diagram below, this is considered the safest configuration for twins in utero as the completely separate amniotic sacs and two discrete chorions act as barrier membranes that prevent umbilical cord tangling or one twin interfering with the development of the other.

---

[1] This technical information is synthesized from both parties' expert testimony, primarily Drs. Filly (Report of Proceedings (RP) (February 19, 2014) at 454-497), and Patten (RP (February 10, 2014) at 195-295).



Monochorionic twins, however, share the same placenta and have intermingled circulatory systems, which can lead to additional complications such as twin-to-twin transfusion syndrome (TTTS) and intrauterine growth restriction (IUGR). TTTS is a condition in which the blood flows unequally between monochorionic twins that share a placenta, causing one twin to receive too much blood, and the other twin to receive too little, resulting in damage to both. IUGR occurs when there is unequal placental sharing between monochorionic twins that leads to the suboptimal growth of one twin, and is colloquially referred to as a "stuck twin" diagnosis.

An ultrasound on January 17, 2008, indicated that Taylor Pitts had died in utero. Ms. Pitts had an emergency cesarean section that same day and safely delivered Samantha. The obstetrician, Dr. Ronald Hardy, reported the following:

> Twin A [Samantha]: baby A delivered, and there was no evidence of any fluid or even an intact [amniotic] sac around baby B [Taylor]. The sacs seemed to be communicating and acting as if 1 sac, though there seemed to be [chorionic] membranes between and wrapped around baby B.

3

. . . .

Again, there was no clear sac. . . . Baby A's cord, the healthy-appearing, normal cord, was wrapped around Baby B's neck. Baby B's cord, then was wrapped around Baby A's cord and twisted very tightly, almost with a bandlike tightness, forming a loop around Baby A's cord so that Baby A's cord could slide up and down inside this loop and then Baby B's cord was tightly interwoven.

. . . .

The placentas were delivered. They were connected with 2 separate cord plates. The cords seemed to traverse between the 2 membranes—it was quite unusual appearing—suggestive of a possible incomplete formation of diamniotic sacs, or potentially early on the babies could have intermixed and intertwined with each other.

CP at 232-233.[2]

The Pitts sued Inland, alleging negligence that led to Taylor's death and asserting additional causes of action. One negligence theory that later came to the fore was a lost chance of a better outcome claim. The issue arose when one of the experts for the plaintiffs testified during a deposition that the twins had a 90 percent chance of a better outcome if their condition had been appropriately diagnosed by Inland following one of the early ultrasounds. Inland moved for summary judgment on the lost chance theory, arguing that neither the evidence nor the law supported the claim. The trial court took the matter under advisement in order to review the authorities.

The trial court ultimately granted the motion by written memorandum, relying on this court's then recent decision in *Estate of Dormaier v. Columbia Basin Anesthesia,*

---

[2] Pathologist Dr. Wayne Riches analyzed the placenta after delivery and concluded that the pregnancy likely was monochorionic diamniotic.

4

No. 32512-1-III
*Pitts, et al. v. Inland Imaging, LLC, et al.*

*PLLC*, 177 Wn. App. 828, 313 P.3d 431 (2013). The case eventually proceeded to jury trial before the Honorable Kathleen O'Connor in February 2014. The bulk of the issues argued on appeal occurred during trial; other claims were related to discovery issues. The facts relating to those contentions will be addressed in conjunction with our discussion of the issues.

The experts agreed at trial that the umbilical cords had become tangled, leading to Taylor Pitts' death, but disagreed on how that came about. The plaintiffs' experts contended that the twins had always been within the same chorion and that Inland had failed to observe that fact, while the defense experts had other competing theories. The jury returned a verdict in favor of Inland, finding that it was not negligent. The Pitts then timely appealed to this court. The case was submitted to a panel without argument.

ARGUMENT

Appellants raise six claims, five of which are related to events occurring during trial. We first address the summary judgment ruling on the lost chance claim before turning to the remaining claims.

*Lost Chance*

The trial court ruled that the lost chance theory was inapplicable to the facts of this case because there was a 90 percent chance of survival if the treating physician had been properly advised. CP at 585. In that circumstance, the "lost chance" exceeded 50 percent, a figure this court has previously concluded was actionable instead under

5

traditional tort causation principles. Although we maintain that position and affirm the trial court, there is an even more fundamental reason why the claim lacks merit. It was the alleged negligence of the defendants, not the underlying medical condition, which caused the injury. In those circumstances, loss of a chance does not apply. We first consider the bases for the lost chance doctrine before considering its application to this case.

An appellate court will review a summary judgment ruling de novo and consider the same evidence heard by the trial court, viewing that evidence in a light most favorable to the party responding to the summary judgment. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). If there is no genuine issue of material fact, summary judgment will be granted if the moving party is entitled to judgment as a matter of law. *Id.* "A defendant in a civil action is entitled to summary judgment if he can show that there is an absence or insufficiency of evidence supporting an element that is essential to the plaintiff's claim." *Tacoma Auto Mall, Inc. v. Nissan N. Am., Inc.*, 169 Wn. App. 111, 118, 279 P.3d 487 (2012).

Washington's lost chance case law is developing rapidly. The doctrine was initially discussed in the multiple opinions, none of which garnered a majority view, found in *Herskovits v. Group Health Coop. of Puget Sound*, 99 Wn.2d 609, 664 P.2d 474 (1983). In *Mohr v. Grantham*, 172 Wn.2d 844, 859, 262 P.3d 490 (2011), the court recognized loss of chance as distinct injury. *Id.* at 857. The *Mohr* court observed that a

6

loss of chance for a better outcome would be calculated based on expert testimony of "data obtained and analyzed scientifically . . . as part of the repertoire of diagnosis and treatment, as applied to the specific facts of the plaintiff's case." *Id.* at 857-858 (internal quotation marks omitted).

The court found that it was necessary to ensure a plaintiff could bring a loss of chance claim as even "the loss of a less than even chance is a loss worthy of redress." *Id.* at 852 (internal quotation marks omitted). "To decide otherwise would be a blanket release from liability for doctors and hospitals any time there was less than a 50 percent chance of survival, regardless of how flagrant the negligence." *Id.* at 851 (internal quotation marks omitted) (quoting *Herskovits*, 99 Wn.2d at 614).

Lost chance claims can be divided into two categories: lost chance of survival and lost chance of a better outcome. *Christian v. Tohmeh*, 191 Wn. App. 709, 729-730, 366 P.3d 16 (2015), *review denied*, 185 Wn.2d 1035, 377 P.3d 744 (2016). In a lost chance of survival claim, such as *Herskovits*, a patient dies from a preexisting condition and would likely have died from the condition, even without the negligence of the health care provider. Even so, the negligence reduces the patient's chances of surviving the condition. *Rash v. Providence Health & Servs.*, 183 Wn. App. 612, 630, 334 P.3d 1154 (2014), *review denied*, 182 Wn.2d 1028, 347 P.3d 459 (2015). In a lost chance of a better outcome case, the patient survives but has been harmed by the underlying medical condition. The question presented was whether the patient's opportunity to have a better

result was reduced in some manner due to professional negligence. *Id*. at 631. That was the issue in *Mohr*. The plaintiff had suffered a severe stroke, but her chance of a better recovery was allegedly lessened by intervening medical negligence. 172 Wn.2d at 857. The court concluded that the loss of chance of a better outcome was not limited to wrongful death actions. *Id*.

This court considered the loss of a chance doctrine at some length in *Dormaier*, a case where an embolism brought about a fatal heart attack during surgery to repair a fractured elbow. 177 Wn. App. at 837-838. There we recognized that loss of a chance is not a separate cause of action within the statutory framework of a medical malpractice wrongful death claim. *Id*. at 855. We also recognized that lost chance "is fundamentally an alternative manner of proving wrongful death causation, available *solely* where the defendant's negligence reduced the decedent's chance of survival by less than or equal to 50 percent." *Id*. at 854-855 (emphasis added). Put in other terms, *Dormaier* recognized that a lost chance claim only applies when the plaintiff already has no more than a 50 percent chance of having a successful recovery or survival from the underlying problem. If there is a greater than 50 percent chance, traditional tort causation principles apply and the negligence, if proven, is the cause of injury. If the chance of a successful outcome from the medical condition is no better than 50 percent, then the question presented is whether the medical negligence somehow reduced that opportunity even more. In those circumstances, the alternative causation approach is used.

8

With these principles in mind, it is clear that the lost chance claim in this case fails

for two reasons. First, appellants based their lost chance of survival claim on the alleged

negligence of Inland. The Washington Supreme Court's decision in *Volk v. Demeerleer*,

187 Wn.2d 241, 279, 386 P.3d 254 (2016), authoritatively rejected that approach. There

is no lost chance claim when the injury is caused by medical negligence. In *Volk*, the

plaintiff (personal representative of the deceased), as here, argued that professional

negligence both (1) caused the loss of plaintiff's life and (2) reduced the chance of

plaintiff's survival. Plaintiff contended that the lost chance doctrine applied both to the

lost opportunity to survive and as a substitute for actual "but for" causation. *Id.* at 278-

279. The court disagreed:

> This argument fails under either approach because the loss of a chance
> doctrine is inapplicable if the plaintiff is alleging that the defendant's
> negligence actually caused the unfavorable outcome—the tortfeasors would
> then be responsible for the actual outcome, not for the lost chance.

*Id.* at 279.[3] For that same reason, the Pitts' claim fails here.

A second reason that this claim fails is that the lost chance substituted causation

analysis that we discussed in *Dormaier* does not apply when the negligence reduces the

chances of survival by greater than 50 percent. There we held that when

---

[3] An even more recent decision is to the same effect. *Dunnington v. Virginia Mason Med. Ctr.*, 187 Wn.2d 629, 637, 389 P.3d 498 (2017) ("A key distinction of loss of chance cases is that regardless of the negligence, the ultimate injury is likely to occur.").

> the defendant's negligence reduced the decedent's chance of survival by less than or equal to 50 percent, the loss of a chance is the injury . . . but where the defendant's negligence reduced the decedent's chance of survival by greater than 50 percent, as a matter of law, the death remains the injury . . . . Thus, a plaintiff may not argue the lost chance doctrine where the defendant's negligence reduced the decedent's chance of survival by greater than 50 percent.

177 Wn. App. at 851. Judge O'Connor correctly applied *Dormaier* to these facts.

In summary, here, as stated in *Volk*, lost chance was inapplicable because plaintiffs alleged that it was the negligence of Inland, rather than the underlying medical condition, that caused the death of Taylor Pitts. Alternatively, even if a lost chance claim otherwise had been proper, it still failed from the substituted statistical causation perspective of *Dormaier* because there was no evidence that the plaintiff's survival chance was reduced by less than 50 percent. Instead, she allegedly lost a 90 percent chance of surviving. There was no lost chance of any kind. The alleged negligence, not the lost chance of some better outcome, was the actionable theory of the case. There was no need to substitute causation theories when plaintiff's evidence showed a 90 percent chance of a favorable result (survival) but for the negligence.

The trial court correctly realized that lost chance was not the true theory of this action. The trial court did not err in granting summary judgment on this issue.

*Rebuttal Witnesses*

Appellants contend that the trial court erred in excluding testimony of two of their experts as a discovery sanction without first undertaking the analysis required by *Burnet*

10

*v. Spokane Ambulance*, 131 Wn.2d 484, 933 P.2d 1036 (1997). There was no discovery

sanction at issue in either instance and the record reveals no abuse of the court's

management authority.

The trial court has "considerable discretion" in allowing a party to develop and

present evidence at trial. *In re Marriage of Zigler & Sidwell*, 154 Wn. App. 803, 814,

226 P.3d 202 (2010). The court similarly has great discretion in the way it manages its

courtroom, ranging from controlling the conduct of the parties to the setting of the

calendar. *Id.* at 814-816 (managing courtroom); *State ex rel. Sperry v. Super. Ct. for

Walla Walla County*, 41 Wn.2d 670, 671, 251 P.2d 164 (1952) (managing calendar).

Discretion is abused when it is exercised on untenable grounds or for untenable reasons.

*State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). Discretion also is

abused when the court uses an incorrect legal standard. *State v. Rundquist*, 79 Wn. App.

786, 793, 905 P.2d 922 (1995).

A discovery sanction that would exclude evidence that affects a party's ability to

present its case amounts to a severe sanction. In such instances, courts first must

consider the *Burnet* factors before imposing such sanctions. *Keck v. Collins*, 184 Wn.2d

358, 368, 357 P.3d 1080 (2015). Under *Burnet*, before imposing discovery sanctions

such as dismissal, default, or exclusion of testimony, the court must presume that a late-

disclosed witness will be allowed to testify absent finding (1) the opposing party's willful

violation of the court's discovery orders, (2) the violation substantially prejudiced the

opposing party, and (3) consider, on the record, if lesser sanctions would be insufficient. *Burnet*, 131 Wn.2d at 494.

Here, the trial court ruled that proposed witness Professor Carolyn Coffin, who was expected to testify about the standard of care for sonographers, could not testify. It also ruled that Dr. Harris Finberg, disclosed as a witness after the discovery deadline due to the depositions of defense witnesses occurring late in the process, would be limited to providing rebuttal testimony. The Pitts claim that the court excluded these two witnesses as a sanction for late disclosure of their names and erred by doing so without considering the *Burnet* standard on the record.

However, that is not what happened. Both Coffin and Finberg were identified as rebuttal witnesses in court at a hearing held January 17, 2014; each had been identified as new witnesses on December 30, 2013. CP at 497, 982; RP at 103, 105-106. Inland moved to exclude the witnesses for late disclosure, citing to *Burnet*. CP at 497-504. The trial court denied the motion, indicating that the two would be able to testify as rebuttal witnesses, with the subject matter of their testimony to be determined later. CP at 949. Subsequently, the sonographers were dismissed as defendants at the end of the Pitts' case-in-chief, with the court ruling that no expert testimony had been presented concerning the standard of care by a sonographer. Accordingly, Professor Coffin no longer had any testimony to rebut since no evidence was now needed concerning the sonographers' standard of care.

12

After testimony developed at trial, the court ruled that Dr. Finberg would not be able to testify concerning either IUGR or TTTS because neither topic came up during the defense case. The defense experts had testified that the membrane around Taylor had unexpectedly ruptured, an event that could not have been foreseen. The trial court authorized Dr. Finberg to address that topic.

Thus, Dr. Finberg was not excluded from testifying as a sanction for the late disclosure of his identity. Instead, his testimony was limited to its stated purpose—rebuttal. He was not permitted to testify about topics that had not been raised by the defense since there would be nothing to rebut in that instance. The trial court had very tenable reasons for limiting Dr. Finberg to proper rebuttal testimony.

The court did not abuse its discretion in excluding Professor Coffin's testimony and limiting the scope of Dr. Finberg's testimony. There was no error.

*Dr. Finberg Video Testimony*

The trial court authorized Dr. Finberg to testify by videoconferencing so that the jury could see and hear the testimony. The last witness in the trial, Dr. Finberg, was to testify at 1:30 p.m. on February 19, 2014. Judge O'Connor directed counsel to be present on the 19th no later than 10:00 a.m. to set the equipment up and confirm it was working correctly.

By noon, the equipment was not set up properly. The judicial assistant advised counsel that the room would be locked at noon for the lunch hour and that Dr. Finberg

13

No. 32512-1-III
*Pitts, et al. v. Inland Imaging, LLC, et al.*

would not be testifying since the equipment was not ready. When court reconvened at 1:30 p.m., the Pitts did not object to the inability to use Dr. Finberg. The case proceeded to closing argument.

After the verdict, the plaintiffs moved for a new trial on several grounds, including the inability to call Dr. Finberg. The court denied the motion. With respect to Finberg's testimony, the court stated:

> Finally I do want to say a couple of things about this situation that occurred with Dr. Finberg. As counsel is both aware, we had set out a time schedule. . . . I knew that there were going to be issues with the testimony because of the physical things involved. All of the experts were testifying looking at sonograms, some were fixed, some were moving, and that was a major part of all the experts' testimony. So if the jury was going to understand anything Dr. Finberg was going to say, they had to have that ability to both see him and see what he was looking at so that that testimony would be helpful for them.
> As a consequence, and I think the record should reflect, that we stood down. I stood down. We were done. I gave the defendant—or excuse me, the plaintiff, that morning, half a day, half a trial day, where the jury was not told to come in until the afternoon to get this set up. I also set that I wanted the call to go through and we to know by 10:00 whether it was going to work or not because Mr. Riccelli was using his own equipment. He did not have anybody assisting him. I thought this would be somewhat of a difficult technical issue. I recall that my judicial assistant came in and said they are having some problems. . . . It was never going to be an easy thing to get him there by audio/visual but it just did not work. Comes 10:00 it hadn't even been set up, and by noon it still wasn't working. I am satisfied that we gave the plaintiff ample opportunity, we gave them a whole half a day of trial to get this in place and it did not happen.

RP at 661-663.

14

A party aggrieved by a trial irregularity "must request appropriate court action to obviate the prejudice before the case is submitted to the jury." *Spratt v. Davidson*, 1 Wn. App. 523, 526, 463 P.2d 179 (1969). "Trials must be fair but they need not be perfect." *Zigler*, 154 Wn. App. at 815. Trial courts have wide discretion to "conduct trials fairly, expeditiously, and impartially." *Id.* Under RAP 10.3(a)(6), a reviewing court need not consider arguments not supported by any citation of authority. *In re Marriage of Fahey*, 164 Wn. App. 42, 59, 262 P.3d 128 (2011).

Here, the Pitts did not challenge the decision to not wait any longer for the rebuttal testimony at a time when the trial court could have done something about it. They also have not presented any argument that the trial court abused its discretion in ruling as it did. Accordingly, we could simply conclude that this issue is waived and/or abandoned.

However, the argument also is without merit.[4] The trial court gave ample time for the plaintiffs to set up the equipment in order to permit Dr. Finberg to testify. Having already set aside a whole morning from the trial schedule to permit the equipment set up, we agree that the trial court had more than accommodated the plaintiffs in this regard, particularly when there was no request for additional time or any hint that the technical problems could be rapidly resolved.

---

[4] In light of the fact that Dr. Fenberg did not testify, we need not decide whether the court erred in limiting the scope of his rebuttal testimony.

15

The court had tenable reasons for ruling as it did. There was no abuse of the trial court's management authority.

*Defense Expert Testimony*

Next, the Pitts argue that the trial court abused its discretion in permitting three defense witnesses to testify concerning causation. The trial court having exercised its discretion in winnowing down the number of experts each side could call prior to trial, rulings that are not challenged on appeal, we see no abuse of discretion in permitting the witnesses who did testify to do so.

Again, well settled standards govern our review of this issue. To be admissible under ER 702, expert witness testimony must be relevant and helpful to the trier of fact. *Stedman v. Cooper*, 172 Wn. App. 9, 16, 292 P.3d 764 (2012). Where there is no basis for the expert opinion other than theoretical speculation, the court should exercise its discretion and exclude it. *Queen City Farms, Inc. v. Cent. Nat. Ins. Co. of Omaha*, 126 Wn.2d 50, 103, 882 P.2d 703 (1994). Also, a party may not appeal an error based on a ruling that admits evidence unless a timely objection or motion to strike is made. ER 103(a)(1); *Faust v. Albertson,* 167 Wn.2d 531, 547, 222 P.3d 1208 (2009). A party who timely objected, however, may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial. *Faust*, 167 Wn.2d at 547.

With respect to the testimony of Dr. Callen, whom the Pitts accuse of exceeding the scope of his permitted testimony, there was no objection to that testimony. If they

believed his testimony, which they elicited on cross-examination, was improper, their remedy was to seek immediate relief from the trial court. Having not objected at trial or moved to strike the testimony, they may not ask this court to grant relief for an unpreserved error claim.

Dr. Filly testified that scar tissue (synechiae) may have appeared to the Inland radiologists as a twin peak sign and confused them concerning the nature of the pregnancy. On cross-examination, Dr. Filly discussed the unusual nature and unlikelihood of his synechiae theory during his cross-examination. RP at 412. Though there had been no physical examination of Amanda Pitts to confirm the theory, the testimony was not completely unhelpful to the jury. It underscored (1) the unusual nature of this pregnancy and its outcome, supporting Inland's defense that it followed the standard of care, and (2) that the Pitts had no superior theory of causation to one so wholly speculative as to be impracticable. Because the testimony had some value to the jury, the trial court did not err in permitting it.

There were tenable grounds for admission of the testimony. The trial court did not abuse its considerable discretion in this area.

*Proposed Voir Dire of Dr. D'Alton*

The Pitts next complain that the trial court erred in refusing to allow them to voir dire Dr. D'Alton about the potential for IUGR and TTTS. Dr. D'Alton had stated during her deposition that neither condition was present during the pregnancy. The defense did

17

not develop the topics during her trial testimony. The plaintiffs sought to voir dire the witness on the topics in order to set a foundation for Dr. Finberg to "rebut" Dr. D'Alton and suggest these conditions as possible causes for the death of Taylor.

The trial court declined to permit the voir dire because it was not a proper subject of inquiry at that point. Dr. D'Alton had not relied upon either IUGR or TTTS, nor had the Pitts developed either topic during their case-in-chief. This was, as the defense argued, an attempt to set a foundation for Dr. Finberg to develop a new theory of liability during rebuttal in violation of the pretrial rulings and Finberg's status as a rebuttal witness. These were very tenable reasons for rejecting the voir dire.

Once again, there was no abuse of the trial court's evidentiary and trial management authority.

*Cross-Examination of Dr. Patten*

Finally, the Pitts also contend the trial court erred in allowing Inland to cross-examine their expert radiologist, Dr. Patten, concerning the twin peak sign, a topic admittedly outside the scope of his expertise. Dr. Patten did not discuss the topic during his testimony describing the standard of care for radiologists interpreting sonograms. No objection was raised until the latter stages of the cross-examination, when the plaintiffs claimed the topic was beyond the scope of the doctor's expertise. The trial court overruled the objection, and Dr. Patten testified that while he was not an expert because he did not write on the topic, he knew how to use the twin peak sign in his work.

ER 611(b) limits the scope of cross-examination to "the subject matter of the direct examination and matters affecting the credibility of the witness," but also permits the trial court discretionary authority to allow "inquiry into additional matters as if on direct examination." Accordingly, courts recognize that "the scope of cross examination is within the broad discretion of the trial court and will not be overturned on appeal absent an abuse of discretion." *Miller v. Peterson*, 42 Wn. App. 822, 827, 714 P.2d 695 (1986).

Here, Dr. Patten had discussed the twin peak sign at some length before the plaintiffs claimed he was addressing a topic beyond his expertise. At that point they had waived any objection to the topic. However, even if the belated objection preserved the issue, there was no error. Inquiry into an expert's knowledge base is permitted by ER 611(b) (and ER 703). Dr. Patten's earlier testimony discussed the standard of care in determining the chorionicity of a twin pregnancy by assessing the thickness of the chorion membrane, a measurement that bears relation to the visibility of the twin peak sign. All parties agreed that the twin peak sign is widely used and reliable when seen. On direct examination, Dr. Patten had read from Dr. Callen's book ("the OB-GYN Bible") and referenced sections directly before and after a section on the twin peak sign. These facts placed a discussion of the twin peak sign well within the scope of Dr. Patten's direct questioning. It was proper to permit inquiry on the topic during cross-examination.

19

No. 32512-1-III
*Pitts, et al. v. Inland Imaging, LLC, et al.*

The trial court did not err in overruling the objection. Discussion of the twin peak sign was proper subject matter for testimony concerning a radiologist's standard of care.

Appellants have not demonstrated any error occurred at trial, let alone any error of such significance that it calls into question the jury's verdict. This case was well tried and both sides presented evidence concerning the circumstances leading to the tragic death of Taylor Pitts. The jury concluded that negligence by Inland had not been established. That verdict was the result of a fair trial process.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Pennell, J.

20